BEULAH P. McCLEES *v.* J. SHERIDAN McCLEES.

J. SHERIDAN McCLEES *v.* BEULAH P. McCLEES.
[Nos. 57, 58, 59, 60, October Term.]

*Decided January 13th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and SLOAN, JJ.

*Isaac Lobe Straus* and *William Pinkney Whyte, Jr.,* for Beulah P. McClees.

*Frank Driscoll* and *William H. Lawrence,* for J. Sheridan McClees.

DIGGES, J., delivered the opinion of the Court.

The bill in this case was filed by the wife, alleging cruelty and desertion on the part of her husband, the appellee, and praying for a divorce *a mensa et thoro,* alimony *pendente lite* and permanent, and counsel fees. Pending the litigation in the lower court, the chancellor made an allowance of alimony to the wife of $50 a week. The case was heard in open court, and resulted in a decree, dated June 18th, 1930, wherein two things were ordered: First, the divorce was denied and the wife's bill dismissed; second, the husband was required to pay a fee of $1,500 to the wife's counsel for services in the lower court. There are four appeals in one record. The appeal in No. 57 is by the wife from that part of the decree dismissing her bill. The husband appealed from that part of the decree allowing the $1,500 counsel fee; that appeal is No. 59. On the same day that the decree was passed, on petition of the wife, the court ordered the payment of $25 per week as alimony pending the appeal, and a $500 fee to her counsel for services in this court. The wife appealed from this order, contending that the alimony and counsel fee were not sufficient in amount; and this is the subject of the appeal in No. 58. The husband also appealed from that order, contending that, the lower court having denied the divorce, there should be no allowance of alimony pending the. appeal, nor

allowance of counsel fee in this court. This is the subject of the appeal in No. 60. The wife will be referred to herein as the appellant, and the husband as the appellee.

The marriage of the parties took place in Baltimore on August 1st, 1928. It was not the first matrimonial venture of either of the parties. The husband is fifty-two years of age; and his previous marriage resulted in his having three children, a daughter and two sons, who at the time of the trial were aged eighteen, sixteen, and thirteen years respectively. Their mother and father were married January 26th, 1910, and the mother died May 17th, 1924. On May 21st, 1924, Dr. McClees' father died, and his mother went to the appellee's home, 2929 North Charles Street, taking charge of the home and the children. The appellant is forty-two years of age, and had been married twice before her marriage to Dr. McClees. From each of her former husbands she obtained a divorce, and from her second husband a settlement in the way of alimony amounting to about $11,000. The parties had known each other since about 1901. About eighteen months prior to the marriage, Dr. McClees began paying attention to the appellant, with the object of matrimony. During that period the appellant had met Dr. McClees' mother and children, who were living in his home; and she was fully aware of the fact that she was expected to occupy his home with them. Dr. McClees was the sole support of his mother, who was over seventy-five years of age. His profession is dentistry, his offices being away from his home, and he appears to have had a lucrative practice. The home on North Charles Street is the property of the appellee, a large three-story house, with three rooms on the third floor. The home was nicely furnished, and the doctor employed several servants, cook, chambermaid, and man who attended to the furnace. At the office he had several assistants, including two young ladies as secretaries, and also two janitors. Before the wedding, the parties had agreed on some alterations, repairs, and improvements which were to be made in the home, especially in respect to the

third floor, which entire floor was designed to be the apartment of the husband and wife, this selection being made by the appellant. They had also agreed upon the route of the trip to be taken after their marriage, including New York, from which point they were to go by ship, stopping at Havana, to Vera Cruz, and then on through Mexico. This trip was to last for approximately a month. The arrangements as to the trip were carried out. The wedding was attended by relatives and friends of both parties, although the children were not present, they being at that time with their maternal grandparents in Cambridge, Md. They returned from their wedding trip to Baltimore the last of August or the first of September, 1928, and took up their residence in the Charles Street home. About two weeks after the wedding, Dr. McClees' mother and her daughter, Mrs. Bumgarner, left Baltimore for practically the same trip which the doctor and his wife had taken.

It will be seen that the arrangements, all of which were known to the wife, should have been reasonably conducive to the contentment and happiness of the married couple. This did not prove to be true; for almost as soon as they returned to Baltimore, if, indeed, it did not begin during the wedding trip, disagreements, bickerings, arguments, and quarrels occurred between them. This situation continued, and gradually grew worse; and at times, according to the testimony, resulted in physical encounters between the husband and wife, culminating in the appellant leaving the Charles Street home on August 23rd, 1929, and going to her sister's, where she has since remained. The cause of this condition, the wife contends, was the presence of the appellee's mother and children in the home; while the appellee contends that it was caused by the ungovernable temper and generally hostile attitude on the part of the wife, with the purpose of compelling him either to get rid of his mother and children, or provide a separate apartment outside of his home for his wife.

The testimony is exhaustive in support of the respective contentions, requiring eight days for its presentation, and making up a large record. A thorough study of the record convinces us of the painstaking patience exhibited by the chancellor, and the exactness with which he understood even the minutest details given in evidence. The record presents a case in which, as has been many times said by this court, the atmosphere of the trial is invaluable in reaching a correct and just conclusion. This atmosphere is reflected, to a degree, in the record; but the appearance and demeanor of the witnesses, and their manner of testifying, the chancellor had the benefit of, while it is denied to us. For this reason we are not at liberty to disturb the chancellor's findings of fact, except in cases where they are clearly contrary to the weight of the evidence.

A considerable part of the appellant's brief is devoted to the argument that it is the duty of a husband to maintain a matrimonial domicile where the wife will be free, in the management of the home, from the interference of others. She relies largely upon the case of *Hoffhines v. Hoffhines,* 146 Md. 350, 126 A. 112. The rule there stated was applied to the peculiar circumstances of that case; and in each case such facts must be shown to exist as make the rule applicable. The facts now before us present a case more analogous to the case of *Ewing v. Ewing,* 154 Md. 89, 140 A. 37. In the *Hoffhines* case, the effort was made by a husband, financially able to maintain a separate domicile for his young wife, to require her to live with his parents in a home controlled and dominated by them, while here the home is owned by the husband, is thoroughly comfortable, and even pretentious. The wife was given complete charge, with a corps of servants under her control and direction, ample funds for the conduct of the hame being turned over weekly to the wife, to be expended as she might decide. In addition, it is shown that Dr. McClees' credit was of the best; and his wife was given unlimited authority to buy what she pleased at the stores in Baltimore City, and charge to her

husband's account. Yet it is claimed on behalf of the wife that at least the mother of Dr. McClees, if not his children, should be compelled to leave the home. While it is true that a husband owes the duty to his wife of doing those things conducive to her happiness and comfort, yet this does not mean that he should disregard the duty of caring for and protecting others of his immediate family who are dependent upon him. Common sense does not suggest it, and the law does not require it. Parties to the marriage must realize that the relationship is seldom perfect, and that it is essential to the happiness and contentment of the parties, as well as for the benefit of society, that each tolerate inconveniences, annoyances, even hardships, and make sacrifices for the common welfare. It is for this reason that the law does not recognize trivialities, but requires that the causes for divorce be grave and weighty. Persons having natural or legal duties and obligations before marriage should not be required to entirely relinquish or disregard them upon assuming the marital status.

It would serve no useful purpose to set forth at any great length the testimony contained in this record. As stated, it discloses that the husband and wife lived together but little more than a year, during the whole of which time intermittent quarrels, progressively violent, were engaged in. It indicates a wife of a high-strung, nervous, irritable, and suspicious nature. She repeatedly charged her husband with infidelity, when there is no testimony, even from her, indicating any ground of suspicion in this respect. She charges her husband's mother with being the cause of the disagreements between her and her husband; yet the record is devoid of a single instance where the mother-in-law attempted to exercise any authority in the home, or interfere with the wife's management thereof. It is true she did exercise control over her grandchildren; but this was at the express request of the wife. So, if the mother-in-law was the cause of the discord, it was her mere presence in the house rather than anything she did or said to or about the appellant. The

undisputed circumstances immediately preceding and leading up to the wife's departure from the home on Friday, August 23rd, 1929, were that on Tuesday, August 20th, before the husband returned from his office, she had requested the mother-in-law to go to the theatre, and was told that she was unable to go because her daughter, Mrs. Bumgarner, was coming to see her; that the wife then went to the theatre, and was away when the husband returned to the home, where he found his mother and sister. This was about 8.30 P. M. About 9.30 the sister prepared to return to her own home, and the husband told her, it being very hot, he would drive her home. There being no one else in the house except his mother, he suggested to her that she accompany them to her daughter's home, which she did. They stayed at the daughter's home for a while, returning to the doctor's home about 11.30, put the automobile in the garage, and went in the back way. They heard the radio, and knew that the wife had returned. The mother-in-law went upstairs the back way, and the husband went to the front, where he found his wife sitting in the living room. From this point the account of what occurred is in conflict.

The doctor's testimony is: "We arrived home about five minutes after eleven o'clock. My wife, in the meantime, had returned; I could hear the radio going in the front room. My mother said to me, 'I am going upstairs to brush my teeth and then retire.' So I continued on to the front room. My wife was sitting at the front window. I said, 'Hello, Bee, what time did you come in?' She said, 'None of your damned business.' So I went to the front door to see that the outer glass door was closed and when I came in she said, 'Where is your mother?' I said, 'My mother is upstairs.' She said, 'You are a liar.' I said, 'If you want to talk like that, I might as well go upstairs,' and she turned out the bridge lamps and followed me right upstairs, and I went to the bathroom and was brushing my teeth. When she came in she said, 'Where is that mother of yours?' I said, 'Mother is downstairs.' She said, 'You are a liar.' She then went out

of the room and I did not know where she was going, and I went in the guest chamber where I had been sleeping for the last five nights, and I had removed my collar and shirt and was sitting on the edge of the bed and was just putting one shoe underneath the bed. I had not removed my pants, when she rushes into the room in her night clothing, and she slammed the door very hard and she grabbed me by the hair and she pushes me back over the chair and she said, 'Why in the hell do you want that God damned old seventy-five year old mother of yours snooping on me downstairs in the closet?' Then she turned my hair loose, or I wrenched her hands from my hair, rather, and when I got up or getting ready to get up, she said, 'Damn you, I will ruin you for life, you have been running around with women,' and with that she took her heel and rammed it between my legs and I was in agony. I got off the bed hurried and I grabbed her and she tore my undershirt off me. I was then like a coal heaver on a ship, stripped from the pants up, with one shoe off and one on. I wanted to get out of the door and she would not allow me, she pushed against me each time, she pushed her body against me each time. She then tried to scratch me with her hands, she continually tried to kick me with her knees. I said, 'Bee, if you don't stop this, I will have to slap you,' and she didn't, so I slapped her with the palm of my hands. I finally got the door open and the hallway was dark, but there was a light in the room where this episode took place and I called my mother; I knew if I called my mother she would get quiet immediately. I called for her to light the light and she lit the light in the hallway, and I had my wife around her waist to try to protect myself, and she bit me in the left shoulder and also scratched that left shoulder terrifically. When my mother entered the hallway she threw her arms around my mother and she said, 'Oh, Mrs. McClees, I have always blamed you for those things, but it must be your son.' I took my clothes and went downstairs. I was almost exhausted, it was a terrifically hot night and I went down-

stairs in my daughter's room and there is where I remained for the night."

The wife's account is that after she returned home from the theatre she locked the house and waited until about 12 o'clock in the living room, at which time her husband returned. "He came into the living room where I was. He said, 'Where have you been?' I thought he expected me to be mad because he was out until quarter of twelve, I said, 'Who wants to know?' He said, 'I do.' I said, 'I have been home hours before you have, what difference does it make?' He went over and turned off the radio. I said, 'Don't turn off the radio, I am not going up yet.' He said, 'What do you want to do, have a fight?' I said, 'Where is your mother, Sheridan?' He said, 'Upstairs.' I said, 'Oh, no, she isn't, I looked all through the house as I came down.' He said, 'You are a damned liar, she is,' and he was going up the stairs. I sat and listened to the radio for a few minutes, probably not more than five, when I thought, 'Well, for some reason Mrs. McClees might have stayed in and she phoned him and he knows all about it.' I turned off the radio and went upstairs and switched off the lights. When I got within three steps of the top Dr. McClees was in the third story back room. I looked down and there wasn't a ray of light to be seen anywhere. I called to him and said, 'Sherry, your mother isn't down here.' He said, 'You are a damned liar, she is.' I went to the back of the house—I did this, your Honor, because I had left that door locked and knew Mrs. McClees could not get in and I would be blamed for trying to keep her out of the house. I took in the boy's room, I took in Mrs. McClees' bathroom, turning on each light. I turned the light on in Mrs. McClees' room, the lamp sitting on the desk, I left that on because I was going into the second story front room. On the way down to the hall I thought I had looked everywhere except Mrs. McClees' closet, or I thought that, I did not know. I went to that closet door and had my hand up ready to put it on the door, when a voice inside said, 'Who is that?' I said, 'Just

me, Mrs. McClees.' 'Well, what do you want, prowling around my room?' I said, 'Well, I certainly don't bother myself prowling around your room.' Then I went upstairs to the third story front room where I undressed. It took me at least ten minutes to undress because I brushed my hair and cold creamed my face, and all this time I was wondering just why it was without a ray of light a woman as old as Mrs. McClees was doing there without a light. There was no light downstairs. I couldn't imagine what the idea was. So I went back in the room. The shades were pulled entirely to the bottom. We had been in the habit of leaving these shades up probably two or three inches. Dr. McClees was standing in the front of the room, on the third floor back, he was standing in the middle of the floor. He had taken off his shirt, collar and tie. I walked in the room right up to him and I think I closed the door as I went in. I said, 'Sheridan, just why did you have your mother there in the closet downstairs without a ray of light anywhere; what do you expect to see around here?' He said, 'You are a damned liar.' I said, 'That is exactly where I found your mother.' He grabbed me with his left hand by my right shoulder and with his right fist, he hit me right in the mouth and pulverized one tooth—this tooth has replaced that one—and cut my lips. I said, 'Oh, you are a perfect little coward,' and I took his glasses off and threw them on the bureau and as I did, he hit me back of the ear. I don't know how I got on that bed, because it was a wooden bed and I was standing near the center, but when I opened my eyes and realized where I was, I was catercornered across the bed, and just as I opened my eyes I could hear Dr. McClees say, 'Now, damn you, lie there and make out you are dead.' I got up and sat on the side of the bed. The next thing I remember I was on the left side of the bed, my feet were on the floor, my hips were across a box spring that was in that bed, my back was on the bed. Dr. McClees was up in that bed sitting with his heels on my stomach pressing the breath out of me. I said, 'Are you trying to

kill me, Sherry?' By that he hit me with his fist in the chest. I reached up and grabbed his hair. I thought if I could get myself from under him I could probably protect myself, and as I pulled his hair he started in with his fists, hitting me between the temple and the ear, twice in the right eye, once in the left eye, and then on my jaw, with his fist. I will never to my dying day forget that fist coming to my face when I was absolutely helpless to protect myself. I had bruises on my arms, my entire spine was bruised where I had been struggling to get away from that wooden box spring. I was bruised all over. Dr. McClees got up, went around to that wooden bed, went to the door. He said, 'Mother, call in a doctor and come up here.' 'I said, 'I don't want your mother, neither do I want a doctor.' I got hold of the wooden bed and pulled myself up. I thought my face was burning so badly if I could only get to the bathroom and get some water. As I got to the bathroom door—one door opens almost directly into the other, a matter of inches—I realized I was going to fall and grabbed for his shoulder and as my hand touched his shoulder he broke away and I fell full length into the hall. He grabbed his clothes, went through the next room, down the stairs to the second floor, and went to bed. I presume he went to bed. His mother did come up and she did say, 'Why, Bee, what in the world is the matter; when you passed me there you were humming.' I said, 'Because I was too darn solicitous of your welfare, your son beat me up.' I said, 'If you had had a light, Sheridan wouldn't have beaten me the way he has; now look what he has done to me.' She said, 'Let me help you up and do something for you.' I said, 'No, don't touch me; it is every bit your fault.' But she insisted on helping me up and she did. She helped me to lie on the bed. My nightgown was torn in ribbons. I still have it. She insisted on putting on a fresh gown. I said, 'No.' Then she insisted on putting on some cloths on my face. She did. She asked me why I blamed it on her. I said I realized I was in the house at the mercy of those two people that

despise me—well, at least one of them did. She said, 'If I go downstairs and tell the doctor you are criticizing him, he will come up and do the same thing again.' I said, 'Well, maybe he will.' She went downstairs. I went to the bathroom. I was sick and uncomfortable. She came back and brought up a dose of aromatic spirits of ammonia."

The mother-in-law testified that on the night of the 20th, when she and her son returned from her daughter's, he went on front, and she said, "I will go up the back stairs." I had not turned on any lights in my room, and I saw as I came out of the bathroom the lights all out and they had gone upstairs, and I went in my room in the closet to get my night clothes, and after I was in there I heard a confusion, presently I heard some one in the room. As I started to turn on the light she came to the closet door. She says, 'Oh,' and threw up her hands. I said, 'Why, what is the matter?' She said, 'I want to know if you are in.' I said, 'Yes, I am in.' And she says, 'All right,' and on she went upstairs. In a few moments I heard a great confusion up there. My son had gone up. At that time he was in the back room on the third floor. Presently time went on and it was between twelve and one o'clock, something around there, and the noise kept up so great I did not know what was the matter, and presently I heard my son holler, 'Come upstairs.' I turned on the light and I went up and turned on the light and as I did, I saw him standing—he had already undressed, with his shirt and collar off, and was standing there with his pants on and one shoe on and his underclothes torn off him, and she was screaming and carrying on and I said, 'What in the world is the matter?' Then she said she wasn't to blame and she asked me if I would forgive her. She said she had always blamed me for everything and she had always wanted to come to me and ask my pardon, that I wasn't in the fault, that she did not blame me for anything at all. I said, 'What is all this trouble?' And after I got there I got up to her room and asked her not to be screaming and making such a commotion that the neighborhood would

hear her, but she continued that, and she said she was going to leave and I said, 'You better be quiet and lie down.' So I went down to my room. After that I did not go up there any more."

From this it will be seen that the husband and wife each allege the other was the aggressor and was responsible for the physical encounter at that time. The mother-in-law was not present when the encounter took place, and did not go up to the third floor until called by her son. From the time she reached the third floor, her description of what took place is about as the son described it, and is not in conflict with what the wife says, except that the wife's testimony is that the encounter took place in the third story middle room, while the other two say it was in the guest chamber, the third story back room, where the husband had been sleeping since the night of August 17th, that being the last time the husband and wife cohabited. There seems to be no doubt that, when the mother-in-law did go to the third story, she assisted the wife to bed, put a fresh nightgown on her, and applied cold cloths to her face, acts which do not indicate hostility towards the wife. It seems to be uncontradicted that at that time the wife, in substance, stated that she had previously blamed her mother-in-law for conditions, but that she wished to apologize and ask to be forgiven. The husband states that he slapped his wife with his open hand to protect himself, while she says he struck her several times in the eyes with his fist. As a result of this encounter, the wife's face was discolored and swollen, this condition being shown by photographs filed as exhibits. These photographs were taken in the home on Friday following, being the day upon which she left.

On Wednesday morning the husband, wife, and mother-in-law ate breakfast together, and the husband went to work as usual. On Thursday, being the cook's day off, breakfast was prepared by the mother-in-law, and the husband took the wife's breakfast to her on the third floor. The witness Mary Ruth Parks, a niece of the wife, testified that she received a phone call and went to see her aunt on Wednesday evening; that she found her aunt lying on the bed, with "her right eye

completely closed, the left eye was half-way closed, and both eyes had rings around them; she had a bruised arm, her face was all swollen up, her nose was swollen, her face was bruised, her lip was swollen, her arm was swollen and sore where it was bruised." She was asked: "Q. What did Dr. Woody do for her that you saw? A. I did not see Dr. Woody do anything for her; the only thing I remember was a horrible looking piece of raw beef that she had on her eye." Witness stated that she had dinner with Dr. McClees and his mother, and again went upstairs to her aunt's room, stayed there that night, left next morning, Thursday, and did not go back after that.

The testimony of Dr. Woody, the wife's personal physician, is that he saw her on August 21st; that at that time "she had bruises about her face, multiple bruises, associated with varying degrees of swelling." "Q. Where were the bruises, if you can recollect? A. Well, I don't recall that. They were generally over the face, but my recollection is that they were about the eyes and nose, about the face generally. I cannot specifically say." The doctor was then shown the photographs, and said: "I don't recall the bruises at that August 21st visit that are apparently brought out on the arms. The bruises about the face resemble very closely those that I saw on the 21st. "Q. That isn't, then, an exaggerated photograph of her condition? A. I should not say so. Q. Could you do anything for her, doctor? A. Well, I am quite sure I did what I usually do, or what I do under those conditions. I advised bed. I think possibly Mrs. McClees was in bed at the time I saw her, and I advised cold applications. Q. Do you recollect examining her back and sides? A. I recollect that Mrs. McClees complained of pains generally. I don't recollect any evident bruises over the back. I am quite sure I made an examination if I heard the complaints, but I don't recall any bruises."

On the 21st or 22nd the wife consulted a lawyer in respect to obtaining a divorce, who advised that she have photographs taken; which was done on Friday the 23rd, and which show the swollen and discolored condition of her face. The bill of

complaint was filed by the wife on the 6th day of September, 1929. It appears that after her leaving the house she made purchases at various stores of articles of clothing and footwear, amounting to between $125 and $150, which she charged to her husband's account, and which he paid for. There is also testimony in the record of several other physical encounters, beginning within a month after the ending of the wedding trip. These resulted in varying degrees of injury to both parties, the wife claiming that on one occasion her shoulder was dislocated, while the doctor in attendance found no dislocation; and the husband testifying that, upon one occasion the wife struck him on the ear, seriously injuring the eardrum. The wife admitted the lick, but denied that the drum was punctured.

The record is replete with evidence as to the violent temper of the wife, and profane and abusive language directed to her husband, her mother-in-law, and the children. It is needless to record these expressions, but there can be no reasonable doubt as to their having been used by the wife, because they are testified to by numerous witnesses on numerous occasions, and are only half-heartedly denied by her. The wife says she still loves her husband, and wants to live with him, provided he establish a home wherein they can live by themselves, which is equivalent to refusing to return to his present home.

The chancellor, with the most satisfactory opportunity, has determined that there has been no constructive desertion on the part of the husband, and no cruelty established such as the law recognizes as a cause for divorce *a mensa et thoro*. After a careful consideration of the record, we are in agreement with that conclusion. We find that the presence of the children and mother-in-law in the home, they being dependent upon the husband, does not constitute constructive desertion by the husband and does not justify the wife in leaving. As to the acts of alleged physical cruelty relied upon, it is sufficient to say that, in our opinion, they were brought on by the words and acts of the appellant, and that what force was applied to the person of the wife by the husband was to

reasonably protect himself from her aggressions, there being apparently little difference in their physical strength. There is no evidence whatever of the wife being in physical fear of the husband. On the contrary, the whole record discloses an attitude on her part of belittlement and contempt for her husband. The language used by this court, speaking through Judge Urner, in the case of *Buckner v. Buckner,* 118 Md. 101, 84 A. 156, 157, is peculiarly applicable to the case before us. He said: "A careful consideration of the testimony has convinced us that the stepmother did not meet the situation in the spirit of cordiality and conciliation which is obviously demanded. From the time of her entrance into the family she appears to have maintained an attitude of sensitive concern for her position as mistress of the household that could hardly fail, under the circumstances, to produce some unpleasant developments. * * * If it be assumed that ordinarily such occurrences as those to which the wife has testified would be sufficient in themselves to justify her in living apart from her husband, we have here to consider the important fact that the defendant, with full knowledge in advance of the marriage that her prospective husband would not give up his daughters as she had proposed, and with thorough appreciation of their sensitiveness to her presence * * * voluntarily assumed whatever possibilities of discord the situation offered, and then contributed by her own attitude in the home to the domestic difficulties of which she complains."

With respect to the appeal in No. 58, which is from an order allowing $25 a week alimony pending the appeal, and a counsel fee of $500 in this court, we are in accord with the order appealed from. It is settled in this state that a wife is entitled to alimony and reasonable counsel fees in divorce actions, pending the litigation, both in the lower court and in this court, except where it be shown that the wife has ample independent means of her own. *Sterling v. Sterling,* 145 Md. 631, 125 A. 809; *Hood v. Hood,* 138 Md. 355, 113 A. 895; *Daiger v. Daiger,* 154 Md. 501, 140 A. 717. The lower court allowed a fee of $1,500 to the wife's

counsel for their services in that court, and a further fee of $500 in this court. Under the circumstances of the whole case, we think these allowances are just and proper, and they will not be disturbed.

Finding no error in the decree or orders appealed from, the same must be affirmed.

> *Decree and orders affirmed; costs of these proceedings, above and below, to be paid by J. Sheridan McClees.*