WILLIAM V. COLLINS *v.* IRENE E. COLLINS

[No. 39, January Term, 1945.]

*Decided May 17, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*Clarence Lippel* and *D. Lindley Sloan* for the appellant.

*Edward J. Ryan* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal, filed November 9, 1944, from a decree dated September 13, 1944, granting the wife (plaintiff, appellee) a divorce *a mensa*, with custody of children and fifteen dollars per week for "maintenance and support" of herself and the children, the wife "likewise to have the use of the home premises," and dismissing a cross-bill of the husband (defendant, appellant) for a divorce *a mensa*. By an order dated October 7, 1944 the decree was amended by increasing the "alimony" to twenty dollars per week; it was "further amended" by a decree dated November 14, 1944, as to alimony (to eighty dollars per month) and custody of the children.

The parties were married on September 17, 1937, in Monterey, Virginia. They have three children. At the time of the hearing, in July, 1944, he was 31, she was 32, the children 5, 4 and 2 respectively. He operates a garage on the Baltimore Pike near Cumberland, and

operates five school buses under contract for the County. He also sells farm machinery as an agent. Before their separation they lived, with the children, in a house owned by them as tenants by the entireties, on the Baltimore Pike, about four miles from Cumberland. His mother, brother and sister live on a farm at Rawlings about twelve miles from Cumberland in another direction.

The husband says the wife was "disappointed" in him shortly after their marriage. For about six years, however, they lived together peaceably and not unhappily.

Since the summer of 1943 the home was "most unhappy." About that time she began to suspect him of "running around with women," when he went out in the evening, dressed in his best clothes, to see farmers, as prospective customers. One night, she says, he "disillusioned" her. He took her with him, but "forgot" the name of the man he was to see and consequently had "nowhere to go." After that she "mistrusted" him. Another night, she says (he denies), she found a handkerchief with lipstick on it in his pocket. In January, 1944, in his absence, she searched his garage and found in his car some contraceptive devices. A young man who drove for him testified that he (the witness) had bought them and put them in the car "to play a joke" on the husband, "to kid him about running around," but had not mentioned them before the wife discovered them.

Near Thanksgiving, 1943, the wife consulted a lawyer about grounds for divorce and about hiring detectives. She was advised that in Maryland "mental cruelty" is not recognized but physical cruelty or adultery must be shown. She hired detectives, with money furnished by her brother, to find out whether her husband was "running around with women." They told her they found indications that he was. The husband denies any such misconduct. There is no evidence of adultery. On the other hand, her discoveries and the explanations she got did not tend to allay any suspicions she had.

"Arguments" and quarrels usually began and ended at home, with nobody present except the children, who

sometimes were frightened to tears. In each instance each party says the other was the aggressor with words and deeds. There is, however, substantial corroboration, by other witnesses, concerning some episodes.

Husband and wife both say the first and last times (he says, the only times) he struck her were the evening of March 17, 1944, and the morning of June 14, 1944.

On March 17th he got home earlier than usual. She was preparing the evening meal; he was shaving; they were "arguing about him going out, and not telling her where he was going." She says he hit her, threw her back in the corner and choked her, she got her hands in his hair till he "left go" of her neck, but before she got out of the door she had to use a chair to protect herself. She screamed and went to a neighbor's. Her mouth was then bleeding. Later in the evening she returned. Meanwhile he had taken the children to his mother's; he returned without them. He denies the first blow, and says she "got in his hair" and he "squeezed" her neck.

The neighbor, Mrs. Zembower, testifies that Mrs. Collins, when she came to Mrs. Zembower's house, was crying and had marks on her neck and around her mouth, which was bleeding. Another neighbor, Mrs. Wakeman, several days later saw marks on her arms, like finger-nail scratches, several marks around her neck and one above her eye. From March 17th and until March 30th, the husband and wife continued to sleep in the same house, but not in the same room, and on March 30th she left the house and did not return until April 12th.

On March 25, 1944, the wife had filed a bill for divorce a mensa on the ground of cruelty. The husband answered, denying the allegations. On April 12th, after testimony had been taken before Judge Huster, the parties became reconciled, and the case was dismissed by agreement. They returned to their home, resumed marital relations and lived together until June 14th. The wife says she was told to "go home and be a good wife." The husband's counsel says that at the conclusion of the testimony,

"Judge Huster gave plaintiff a severe lecture," which was not taken down by the stenographer.

In April, about a week after the hearing in the first case, the wife says the husband came home late, went straight to bed and when she got in bed, hit her in the back with his fist, kicked her out of bed, and when she tried to get back, jumped out of bed and chased her out of the house in her nightgown, without her bedroom slippers. This was about 10:30. She went to the next house, Mrs. Zembower's. Mrs. Zembower gave her some clothes to go to another neighbor's to telephone the sheriff, which she did. She spent the night at Mrs. Zembower's and left the next morning about 5:30. That night she was crying, rather hysterical, Mrs. Zembower says; when she came, she said her husband had chased her from the house. She is fully corroborated as to what occurred at Mrs. Zembower's. The husband says he never heard of this incident until he heard of it in court; if she went out of the house that night, she went after he had gone to bed and came back before he got up in the morning. It was indeed a coincidence if throughout this eventful night in this troubled household he enjoyed uninterrupted sleep.

On Sunday afternoon, June 11th, he went to his mother's farm with the children and left them there. That night, after he and his wife got in bed, they had an "argument." She says (he denies) he forced her to get out of bed by hitting her in the back. He says she got out of bed, hit him with a vanity mirror, went out of the room in a rage, got a "gun" of his and went outside and fired it, returned to the bedroom with the gun loaded, threatened to "exterminate" him, ordered him out of the house, and held the gun within three feet of him while he dressed and until he left. She says she did not get the gun until after he left, when she heard a noise outside and fired out the window, the first time she ever shot a gun; that he got up and dressed while she was in the kitchen, and of his own accord left her alone. He went to his mother's. The next evening he returned. Monday and Tuesday nights they slept in the same bed.

Wednesday morning, June 14th, at breakfast, "argument" began about a settlement. She says, he wanted to give her a settlement if she would give him the children; she would not give up her home, and he said he would force her to leave; when she refused to leave, he started beating her with his fists, and she threw some waffle dough in his face. He denies having beaten her, but says the waffle dough "set him off" and he "smacked her a few times," "hit her on the upper part of the body some place." She ran outside and got a clothes prop, a pole about eight feet long, to protect herself. She says she intended to hit him with it if he came after her, but when he came she "got scared," threw it down and ran, and he picked it up and pursued her. He says that when he came out of the house she followed him to his car, struck him over the shoulder with the pole and jabbed him, and he jerked the pole out of her hand and "took after her."

He chased her down the driveway and hit her over the head with the pole. She fell in the driveway, in the ashes, cinders and stones. He left her lying there, got in his car and drove past her; she rolled over out of the way of the car. Mrs. Zembower saw him chase her and hit her and saw her fall. Two other neighbors heard her scream and then saw her lying in the driveway.

After a time she was able to get up and get to the house. She found her head was bleeding, telephoned Dr. Trevaskis, went in a taxicab to the Allegany Hospital in Cumberland, and remained there about seven days. Before she went she telephoned Mrs. Wakeman, who came and took the children. That afternoon the husband got them and took them to his mother's. Since that day the parties have not lived together.

Before the wife went to the hospital, Mrs. Wakeman says, "her head was bleeding, there was blood running down both sides of her head and her arms were badly scratched, looked like they had fallen on stones and blood was running out of her knees and run down to about her ankles, and she seemed to be very badly done

up." Dr. Trevaskis "found a wound about an inch and a half on the head—not exactly a wound; it was produced by a blunt instrument, a laceration of the scalp and a considerable amount of bleeding, bruises of the shoulder and arms and areas of scratches all over the right side from dragging on the ground, around the knees and elbows and a cut on the one knee about an inch long." At the hearing a month later Dr. Trevaskis showed the scar on her head from the wound.

The bill in the instant case was filed June 21, 1944, the answer and cross-bill June 23rd. The parties each asked a divorce *a mensa*, on the ground of cruelty, and custody of the children. The case was heard before Judges Capper and Huster on July 13th and 14th. On August 25th they filed a full, well considered opinion; in accordance with the opinion the decree of September 13th was signed.

The husband in his brief asks that "the prayers of" his "cross-bill be granted," and also says he "is entitled to a divorce because of desertion." In the closing argument his counsel suggested that the wife is a neurasthenic, and this is the cause of their troubles, and that neither is entitled to a divorce.

On cross-examination the husband said that when the wife ran down the driveway, the reason he did not let her go was: "I was just so mad that I felt that she needed a little remembrance. I figured she had tortured me long enough, and I would give her something to think about."

Doubtless both taxed each other's patience. He was not a Job, nor she a Griselda. He says she goaded him to strike her and give her ground for divorce. She says he tried to unbalance her mentally by suggestion, constantly telling her she was of unsound mind. Actually he was neither so wicked nor so subtle. But he did more to aggravate than to alleviate her nervous condition. At the hearing in the first case he professed a desire that she go to Baltimore and consult a psychiatrist. Her mental condition and the proposed trip became a subject of frequent "argument." When she consented to go, he refused

to let her go alone and she (not unnaturally) refused to go with him. Dr. Johnson, the family physician, the husband's only medical witness, who last saw her professionally on April 24, 1944, says "she was highly irritated due to her fear concerning her husband at that time"— his treatment of her and her suspicion as to his conduct.

It would be futile to attempt to resolve uncorroborated contradictions as to details of words or deeds. It is unnecessary to characterize proved facts already stated. Willful provocation would not excuse the attack with the clothes prop. If the wife was mentally or nervously sick, such treatment would be still more inexcusable.

The lower court in its opinion says:

"Of course, by returning to his home and living with him after the dismissal of the first divorce proceeding, she condoned his cruelty of treatment prior to that time. However, subsequent cruelty by the defendant revived the former offenses. *Fisher v. Fisher,* 93 Md. 298, 48 A. 833.

"It is settled law that a single act of violence will ordinarily not justify a divorce on the ground of cruelty; also that marital neglect, indifference, failure to provide as freely as the wife may desire in dress or conveniences, sallies of passion, harshness, rudeness, and use of profane and abusive language, do not constitute cruelty as grounds for divorce and that only danger to life, limb, or health will constitute such cruelty. *Short v. Short,* 151 Md. 444, 135 A. 176; *McKane v. McKane,* 152 Md. 515, 137 A. 288; *Wendell v. Wendell,* 154 Md. 11, 139 A. 573; *Brett v. Brett,* 169 Md. 704, 182 A. 305; *Bonwit v. Bonwit,* 169 Md. 189, 181 A. 237; *Faulkner v. Faulkner,* 176 Md. 692, 4 A. 2d 117.

"We think a careful consideration of the evidence in this case in the light of these decisions of the Court of Appeals discloses that legal cruelty has been proved against the husband." We concur in this statement of the applicable law and in this view of the evidence. We agree that the husband's "course of conduct throughout a period of months prior to their final separation discloses

that he had little or no regard for the safety and health of his wife and his acts of physical violence * * * fully confirm this," and that the wife "was in fear of her life and health" and "on one or more occasions left the home through fear of bodily injury" and "sought protection at her neighbors.' "

The above definition (or description) of cruelty is an expansion of the language of Chancellor Kent in *Barrere v. Barrere,* 4 Johns. Ch. 187, 189 (1819), which has often been quoted by this court or paraphrased with additions, variations and qualifications not now material. See also *Stevens v. Stevens,* 183 Md. 599, 39 A. 2d 690, 691; *Mason v. Mason,* 181 Md. 666, 30 A. 2d 748, 749. This measure is applicable to cruelty, either as a ground for divorce or as constituting constructive desertion. Cruelty is not the only equivalent of constructive desertion. Constructive desertion may consist of conduct, other than cruelty, which makes life unbearable. *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259; *Kruse v. Kruse,* 179 Md. 657, 663, 22 A. 2d 475; *Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455. But when it consists only of cruelty, the measure of cruelty is the same as when cruelty *eo nomine* is the ground for divorce.

In defense of the husband *McClees v. McClees,* 160 Md. 115, 152 A. 901, and similar cases are cited. In the Mc-Clees case the court found that "what force was applied to the person of the wife by the husband was to reasonably protect himself from her aggressions, there being apparently little difference in their physical strength." 160 Md. 130, 152 A. 906. In the instant case the wife is no such Amazon; she is no match for the husband, either with her hands or with a clothes prop.

As was said in the McClees case (160 Md. 119, 150 A. 902), this is a case in which the atmosphere of the trial—the appearance and demeanor of the witnesses and their manner of testifying—is invaluable in reaching a correct and just conclusion. The lower court had this atmosphere. One of the judges had the advantage of a presentation in two acts, with a three-months inter-

mission. If the record left us in doubt, we should not disturb the findings of fact.

The lower court, after the opportunity of "observing her during her long examination on the witness stand," believes the wife is fully capable of taking care of the children. The testimony of three physicians is to that effect. Neighbors testify that she has always taken good care of the children and the house. There is no evidence or argument to the contrary. We agree that she should have the custody of the children, with the right to the husband to see them and have them with him at appropriate times and occasions.

If the wife is entitled to a divorce, the propriety of the provisions for custody of the children and for alimony, including use of the home, *Roberts v. Roberts*, 160 Md. 513, 522, 154 A. 95; *Westphal v. Westphal*, 132 Md. 330, 332, 103 A. 846, were not questioned in this court. In the absence of the provision for use of the home, some other provision by way of alimony would be necessary for the protection of the wife, to enable her to live elsewhere than in the same house with the husband. *Roberts v. Roberts*, 160 Md. 513, 524, 154 A. 95.

The decree of November 14th (subsequent to the appeal) is not properly before us.

*Decree affirmed with costs.*