### JOSEPH A. SCHRIVER *v.* LOIS G. SCHRIVER
[No. 14, October Term, 1945.)]

228

*Decided November 8, 1945.*

The cause was argued before DELAPLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*William A. Gunter,* with whom was *Edward A. Ryan* on the brief, for the appellant.

*Paul M. Fletcher* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by the husband (defendant, appellant) from a decree for separate maintenance, requiring

payment of $200 per month to the wife (plaintiff, appellee), for the support of herself and two children, awarding her custody of the children, and dismissing a cross-bill for a divorce *a mensa* (on the ground of cruelty) and custody of the children. The grounds of the amended bill are cruelty and desertion, and adultery with a woman who will be referred to as the corespondent, which of course she is not.

The parties were married in 1928; he was 19, she was 20. They have two children, a boy who was 15, and a girl 9, at the time of the hearing (August, 1944). Although throughout their married life (she says) he has frequently struck or beaten her and (he says) she has falsely accused him of misconduct with women, they seem to have lived fairly peacefully until the summer of 1942.

It was stated at the argument that he is over six feet and weighs over 200, she about 120. She is nervous and has low blood pressure, and is under treatment by her physician. She was in a hospital "for her nerves" for about ten days. He has been successful in the automobile supply and allied businesses. He has an office and warehouse in Cumberland and stores in Cumberland and several West Virginia towns. He has been liberal in providing for her and the children. She is intensely jealous—insanely so, if she had no more reason or excuse than he says she had. Jealousy seems to be aggravated by a feeling of inferiority engendered by his business success. Both drink more than is good for their health or their tempers. In physical strength she is no match for him, but in verbal combat she can hold her own. She says her "favorite exclamation" for him is "a heel and a louse." This is a mild specimen of her vocabulary. When angered, she gives vent, in the language of a fishwife and without regard for place or persons, to the fury of a woman scorned.

Both are, or were, fond of the children. In April, 1944, the boy developed tuberculosis. His physician says he has been given the best of care by his mother and is

improving. The boy was loath to take sides between his parents, but through his father's behavior and his mother's appeals for help he seems to have lost affection for his father.

In considering the conflicting testimony we have endeavored to give due weight to the fact that the lower court saw and heard the witnesses.

The wife's testimony as to blows and beatings is corroborated by her sister Mrs. Wilson, who saw her black eyes and other bruises. Her son also says he has seen marks (bruises and bleeding) on her face, saw his father throw a knife at her at supper, heard him throw a cream pitcher and saw where it hit the wall, and on December 26, 1943, saw him slap her face. Once the boy grabbed his arms and kept him from hitting her with his fist. The husband says he has never, since a reconciliation in March, 1943, struck or abused her; he threw the cream pitcher at the wall, because he was so angry; if he had thrown it at her he would have hit her; he has thrown knives for the same reason, not at her but on the floor. A few days before June 15, 1944, a piece of one of her teeth was chipped off. She says he threw a fork at her; he says she stamped on his instep with a high heel, he in pain grabbed her and threw her down, and her head or or mouth struck his head.

Once, when he was in bed asleep (he says) or drunk (she says), she struck him across his bare back with a whip or belt. He says (she denies) she once stood over him with a butcher knife and threatened to cut his throat in his sleep. On December 27, 1943, when she was in a highly nervous state, she went to his office with her son's rifle, after first telling him she was coming "with a gun" and telephoning his brother-in-law (his counsel) that she was going to kill him. The boy telephoned his father that the gun was empty and he had also set a safety device. We agree with the lower court in being unable to find "that she ever had any serious intention of carrying out these threats or that she ever on any occasion inflicted any injury of any consequence upon him."

It is unnecessary to labor the question whether any acts of physical violence by the husband created "danger to life, limb, or health" which constitutes cruelty as a ground for divorce. *Collins v. Collins,* 184 Md. 655, 42 A. 2d 680, 683. The wife herself did not so regard his acts. She left him on June 15, 1944, because of an episode concerning the corespondent. If the episode had not occurred, she would not have left.

In 1942 the husband was away over the 4th of July. He and his wife had had a "spat" the week before; he imagines that is why she didn't go along. While he was away, she took the children to her sister Mrs. Jessie Bradley's camp. Later that month she again took the children to the camp, for a week. He spent a night there. That night, she says, he told her he had had an intimate affair with a girl (he wouldn't say who), but he loved only her and the children, would break the affair off, and did not want her to leave him; she said she would not leave if he promised to break off the affair. He denies any such conversation. When she came back home, she says, she found lipstick on cigarette butts and towels; her bed and her cosmetics had been used. He says he and his brother-in-law spent a night there, the bed was then used and they fixed spaghetti with sauce.

The corespondent is unmarried. At the time of the hearing, she was 23; she had been employed four years, as secretary-bookkeeper, at Lazarus's, a large "ladies' exclusive shop." This was her first job. Occasionally she "goes out on the floor and helps out if they are busy."

In 1941 (she says) she was standing on a street corner talking with a friend and the man (named Flick) whom the friend has since married. Schriver went past, stopped and talked to Flick and was introduced by Flick to the two girls. After that she would sometimes see Schriver when he was going back and forth to lunch, and they would speak. Occasionally she would walk up the street with him on her way home. In that way they

232

would see each other "sometimes once and twice a week, sometimes more."

In June or July, 1942 (she says) she met Schriver one evening after work; they were both walking the same direction, so they started talking. He asked whether she was employed, and where; she told him. He asked whether she would be interested in a job; she said, No, she was very well satisfied and wouldn't think of changing. He went on to say how hard-pressed he was for work in the office and no help to do it because so many had left on account of the War. So she offered to give her time in the evening; she said she was always free in the evening, and could work and would be glad to help him out. Accordingly she did extra work for him, at his office, from around July until September or October. She worked from 7 in the evening to 10 or 10:30 and was paid 50 cents an hour. She worked on "dictation and * * * matters of the estate and compiled bills and checks" and went "all over that type of work."

Schriver and his brother-in-law, Mr. Edward J. Ryan (his counsel), are executors of his father's estate. The estate has been in the course of administration since 1936; the first administration account, a three page paper, was passed July 7, 1944.

A Miss Wintermeyer is Schriver's secretary and also the secretary of his corporation. She has been employed by him five or six years. He very often takes her with him to different places to audit the books of the different stores. Miss Flurshutz, a stenographer, also has been employed at his office since June, 1942.

Schriver says: The corespondent was on vacation at Lazarus's; she was working for him in the evenings, and during the days she would be off. On the evenings she worked for him, she worked while his girls were present. She says, when she worked in the evening Miss Wintermeyer or Miss Flurshutz was always present; they too worked at night. Miss Wintermeyer did not testify. Miss Flurshutz says the corespondent was there when "we worked late one night." This is the only evidence

(other than Schriver's testimony and the corespondent's) that any other employee was ever there when the corespondent worked in the evenings.

One night in June, 1942, after 10, Schriver's wife saw him and the corespondent at his desk in the office. His wife was to meet him at the office. She left before he and the girl left. She decided she didn't want to go home alone. She returned to the office. Schriver and the girl were then leaving in his station wagon. He told his wife to go home; he would be home shortly. She said, No, she was going to follow him, which she did. He took the girl to the post office, where she got out and went into the post office.

In August, 1942, Schriver says he was "summoned * * * to appear on an income tax case" of his father's estate before the Internal Revenue Department in Baltimore. About August 10, 1942, he went to Baltimore and took the corespondent with him. He says he told his wife who was going and asked her to go along, and she refused to go; she says she was neither told who was going nor asked to go. He had to take the corespondent with him (he says) because "it was most essential that I had this assistance in compiling the voluminous report * * * comprising * * * a complete audit of my father's estate, going back a number of years * * * prior to his death." He had "had all the material worked up by an auditor," who had since been called to military service. The corespondent "did all the summarization" of the report, which comprised "bills, receipts, dividends, breakdown of dividends, assets, and so forth"; "after I dictated what to do, she typed it all up." Miss Wintermeyer had done similar work before the War, but at that time "it was impossible to load any more work" on her.

They went to Baltimore on a train that arrived there about 6 o'clock. They sat together in a day coach, and he "gave her dictation." On cross-examination he said the only reason he took her was to "work on the train going down" and give her "adequate work to do the next day"; the only thing she was to do in Baltimore was to tran-

scribe her notes, in longhand. The corespondent says he asked her to go with him because the case was "all on what I had been working on at the office, on the estate matter"; she was "really more familiar with the work" than he was because "she had been doing it on an average of three evenings a week." The time of the trip was either her vacation or a Jewish holiday; they let her take her vacation whenever she wants.

In Baltimore, the say, they went to the Lord Baltimore Hotel, registered in their own names, were given separate rooms (not adjoining), had dinner together in the cafeteria, and never saw each other again until the next afternoon, when they met in the lobby and returned to Cumberland on the 4 o'clock train. He told her he had work to do in his room on the case, and "if she cared to go out anywhere or do anything, she could go ahead and do it" and he could call her the next morning. He went to his room, later came downstairs and had one or two highballs, and went to bed. She went to her room, worked in dictation for about an hour, transcribing it in longhand, then went window shopping and saw part of a moving picture. The next morning Schriver called her, told her he was to appear before the Bureau of Internal Revenue at 9 o'clock and asked her to stay around the hotel, as it might be necessary to call her up and "refer to some of the estate work." At 2 o'clock he telephoned that he had finished his job.

Schriver says he "later stopped having" the girl "in his employ," because of his wife's "suspicious nature." The girl says she ceased working for him because "the work of the estate was all finished by that time" and "at that time we were very busy down in the store and I often did work down there in the evening" and couldn't continue to work for Schriver.

One evening early in December, 1942, in the kitchen at the Schrivers' home, Schriver had a conversation with his wife's sister Mrs. Jessie Bradley, who lives in Baltimore. Mrs. Bradley says, he had something he wanted to tell her; he told her (among other things) he had

"deeply wronged" his wife, had been "unfaithful to her," but in the future "was not going to do anything of that sort"; it was not anybody Mrs. Bradley knew; it was a girl that worked downtown; this affair had started in the early spring and proceeded through the summer, the girl had been very persistent, but recently he had had an understanding with her and it was ended; it was the girl he was with over the 4th of July, he had gone with her on a trip in West Virginia. He called his wife out to join them and said (among other things), "I have told Jessie everything, and I have promised her from now on I am not going to drink after Junuary first, that I am going to devote myself to you and the children." His wife says he said, "I have told Jessie everything and told her that I had given up this girl; that I loved you and only you and wanted to do right by you." Schriver says Mrs. Bradley came out to the kitchen while he was mixing drinks and asked how he and his wife were getting along and he said "We couldn't be getting along better," and at that moment it was true; she asked whether they had adjusted their differences, and he asked what, and she mentioned the 4th of July, and he told her everything, as far as he knew, was straightened out, and she then proceeded to ask his advice about a new job that she contemplated taking. He denies the statements ascribed to him by his wife and her sister.

On December 31, 1942, Schriver and his wife went to a New Year's dance at Frostburg. They got home about 6.30 in the morning. She stayed in bed until afternoon. He got up and left while she was asleep. When she got up, she went down to his office. The office was closed for the holiday. She found the front door locked; she knocked and got no answer. Through a window she saw the corespondent's coat, and a pair of gloves and a scarf. She also saw a back door open with Schriver's station wagon in the back. She ran around, and the station wagon started. Schriver held her and would not let her get in the office. While he held her the corespondent ran.

Schriver says he got up about 11:30 or 12 o'clock, and went down to the office, stopping for a cup of coffee. His wife came about 3. About "one or two o'clock," he was walking to his office, and on the street met the corespondent and Flick, who were waiting for Mrs. Flick to finish her work at a hotel. He invited them to come up to the office and have a New Year's drink with him. They went, and drank a New Year's Day toast. Flick called up his wife to see whether she could join them; he then walked over to get her. There is no evidence, other than Schriver's and the corespondent's testimony, that Flick was ever at the office with them, and none at all that he ever returned or Mrs. Flick ever arrived. Neither Flick nor his wife testified; Flick was overseas at the time of the hearing.

Schriver admits that before New Year's Day his wife had accused him of "running around" with the corespondent. On New Year's Day, after finding him with the girl, his wife left him.

On January 19, 1943, Schriver and his wife executed a separation agreement by which she was to have "the sole and exclusive custody, care and control" of the children and "of their education and bringing up during their minority" and "the exclusive use of the home" owned by Schriver, and he was to pay her $200 a month for the maintenance of herself and the children and also to pay all taxes, water rents, fire insurance premiums and any other public charges against the property. In the event of a divorce, the agreement should be submitted to the Court, and if the Court should hold it had no jurisdiction to incorporate in its decree any or all of the provisions of the agreement, the parties would nevertheless abide by and carry out all such provisions.

From January 21 to January 30, 1943, Schriver was in a Pittsburgh hospital for treatment and a possible operation for sinus trouble. While he was there he wrote his wife a letter, postmarked January 25, 1943:

"My Dearest Lois,

"It made me very happy to be able to talk with you today on the phone, to learn that you and the children are alright. You know this is the first letter that I have written to you for many, many years and it seems kina funny in a way. Any way I mean every word when I call you my Dearest. I am mostly over the sick feeling stage now and the Doctor McMurray (who is Sandy's personal physician) was in a few minutes ago and seems pleased with progress being made. Since arriving here I have not touched anything except for the first nite and the Doctor left the progress of this phase up to me—I am proud to say my sincere desire has allayed the need of further of the stuff.

"Lois, I again want to tell you from the bottom of my heart how sorry I am for the hurt I have caused you and to ask you to forgive my faults. I do love you as I always have and I only ask a little kindness on your part to enable for me to prove to you I do care and to again merit your love and confidence.

"I will appreciate a note from you and phone me any time you feel like doing so—it is awful lonesome here and your interest will be a great big ray of sunshine to me. Looking to hear from you and with

All my Love,

"Joe.

"I do need only you and no one else."

After Schriver returned from the hospital he and his wife discussed a reconciliation, and he asked her to take him back. She says he told her he cared only for her; he hated the corespondent and what she had done to them, breaking up their home. He promised that he would never see her again as long as he lived if he and his wife could only be together again and have their home. He denies this specific promise. He asked her to go with him on a business trip to New York in March; she said, "What, and compromise myself?"; he said he would get separate rooms. On March 7th or 8th, on the train they

became reconciled and in New York resumed cohabitation. She says she did so only on the basis of their previous conversations and his promises.

She says that in the first month or two they were "completely happy." He says they were interested in their home and "spent pretty close to $1,200" remodeling and replacing furniture. Soon after the reconciliation, she says, he told her he and the corespondent had taken the same train to Baltimore; the girl's hat was atrocious, he was ashamed of it"; they were intimate that night; he was thoroughly disgusted and ashamed, and the next morning he left and did not see the girl again until train time. Schriver denies any such confession.

After a few months Mrs. Schriver began again to suspect and accuse him of "running around" with the corespondent. She says she began to discover lipstick and rouge on his clothes. As has already been indicated, by Christmas (1943) their relations were tense and turbulent.

Mrs. Schriver's sister Mrs. Wilson says in February, 1944, at her home she had a conversation with Schriver, in which he said he had had "affairs" with "women" and was sorry he had caused his family so much trouble. The rest of the conversation (Schriver says the entire conversation) related to Mrs. Wilson's private affairs. Schriver denies any such confession.

After the summer of 1943, Schriver says his wife received telephone calls from various "gossipmongers" concerning "reports" on him; he "begged her to disclose the names" and to bring these people to him so that he could prove "they were liars." Apparently one of the "gossipmongers" was a maid in his house, whom he called as a witness. She "reported" at least twice that he had been seen on the street with the corespondent.

From May 3 to May 21, 1944, Schriver was in a Cumberland hospital because he "was in a very nervous condition." He says he "was not in the hospital for alcoholism" nor was he "ever treated for alcoholism in there."

During the spring Schriver and his wife broached the subject of a separation. Each says the other asked for a separation. She says he told her she could have the children and he would give her $100 a month; he says she suggested $100 and he said $100 wouldn't cover the expenses of the children.

June 15, 1944, was the boy's fifteenth birthday. Mrs. Schriver intended to go down and get her ration books and some money from Schriver for a birthday present. She says he telephoned her not to come; he would be home immediately with the money and the ration books. She waited until half past one and then had to go. She reached the office about 2 o'clock. She asked whether any one was in Schriver's office and was told Father McEwen and another person were there. As she knew Father McEwen, she walked back and tried the door. She was told the door stuck a little—on account of recent paint. She says the Yale lock was locked. "It took an awful long time" for Schriver to open the door. She then saw the corespondent sitting in the office, an empty whisky bottle on the desk, and an ash tray filled with cigarette butts with the girl's lipstick on. The girl had a coat on, buttoned up, but "her pompadour was disheveled"; Schriver's hair was "definitely disheveled." Schriver said, "Lois, I gave you your chance. Miss [the corespondent] and I have been sitting here making our plans." Mrs. Schriver was practically hysterical. She telephoned Mr. Ryan and her own lawyer; both came to the office. Later Mrs. Schriver went home, packed Schriver's clothes, took them to the office, and left them for him a little after 5 o'clock. The corespondent had again come in and was then in Schriver's office. The next day, June 16, 1944, the bill of complaint in this case was filed.

Schriver and the corespondent say she had never been in his office between January 1, 1943, and June 15, 1944; they had no association at all. She says she had not seen him; but ever since January 1, 1943, at intervals, she had received frequent telephone calls from Mrs.

Schriver, who called her vile names and gave her no opportunity to say anything, and for some months she had heard rumors, which she ascribed to Mrs. Schriver, to the effect that she and Schriver were "carrying on a very desperate affair." On June 15, 1945, she phoned Schriver and asked whether she could see him. When she reached his office, about half past one, she told him about the rumors and asked him to have them stopped. He says he telephoned Mrs. Schriver to come to the office and told her it was important, but did not tell her the girl was there or why he wanted her to come; he called her "in order that she could sit in a conference" with the girl and him; he and the girl had nothing to drink; that morning a customer (an operator of a fleet of trucks) had asked him to have a drink and brought in a bottle of whisky; after they had consumed the contents, the bottle was left on the desk throughout Father McElwen's visit and also the girl's; the door was not locked but was stuck tight. The girl says, when Mrs. Schriver came in, Schriver asked her to sit down, and "started to tell her the reason I was there," but could not finish a sentence; he made no statement at all about making plans. "Of course, as soon as Mrs. Schriver saw me, she went into a violent rage"; Mrs. Schriver said, "This is the opportunity I have been waiting for," and from there she "went on." Schriver and the girl say, the girl came back the second time that afternoon to tell him she was going to bring suit against Mrs. Schriver and he persuaded her not to do so. They both deny any intimacy or familiarities at any time.

In most cases adultery cannot be shown by direct proof but only by circumstantial evidence. Because of the stigma which a finding of adultery carries, and the possibilities of error inherent in proof of that nature, the general rule is that the quality of evidence required to establish it must be high, and the *quantum* sufficient to satisfy a reasonable mind of the truth of the charge. It need not be proved beyond a reasonable doubt (except in a criminal case), but to justify such a finding, the

evidence must be such as to exclude any reasonable possibility of innocence. It must go beyond facts merely justifying suspicion, and shown facts inconsistent with innocence. *Steinla v. Steinla,* 178 Md. 367, 373, 374, 13 A. 2d 534, and cases cited.

The admission of a respondent, of the facts charged in a bill for divorce, shall not be taken of itself as conclusive proof of the facts charged as the ground of the application. Code, 1939, Art. 16, Sec. 45. *Campbell v. Campbell,* 174 Md. 229, 239, 198 A. 414. On proceedings instituted in consequence of adultery, or for a divorce, no decree shall be entered upon the testimony of the plaintiff alone, but testimony in corroboration of · the plaintiff's testimony shall be necessary. Art. 35, Sec. 4. The principal object of the latter provision is to prevent collusion, and when the possibility of collusion is precluded, the corroboration need be but slight. *Heinmuller v. Heinmuller,* 133 Md. 491, 494, 495, 105 A. 745; *Roeder v. Roeder,* 170 Md. 579, 584, 585, 185 A. 458, and cases cited. In proceedings for permanent alimony or separate maintenance, the same requirements as to proof, including corroboration, are necessary as where divorce is sought. *Roeder v. Roeder, supra.* The corroboration, however, need be but slight, the nature of the proceeding being such as to exclude the idea of collusion. *Engelberth v. Engelberth,* 159 Md. 700, 150 A. 271.

Except so far as Article 16, Section 45, or Article 35, Section 4, may be applicable in any particular case, no statute or other rule of law forbids entry of a decree for divorce or separate maintenance upon evidence of admissions of adultery. Such admissions "unsupported by corroborative proof should be received with the utmost circumspection and caution; * * *. Nevertheless, if, after looking at the evidence with all the distrust and vigilance with which * * * it ought to be regarded, the Court should come to the conclusion, first, that the evidence is trustworthy, secondly, that it amounts to a clear, distinct and unequivocal admission of adultery,

we have no hestitation in saying that the Court ought to act upon such evidence, and afford the injured party the relief sought for." *Robinson v. Robinson*, 1 Sw. & Tr. 362, 393, 394, per Cockburn, C. J.; *Wigmore on Evidence*, 3d Ed. Secs. 2067-2069. Divorces have been granted in England upon admissions which do not even disclose the name of the paramour. *Getty v. Getty* [1907], P. 334; *Woolf v. Woolf* [1931], P. 134. In Maryland, divorces have been granted on evidence consisting largely of admissions of adultery. *Kremelberg v. Kremelberg*, 52 Md. 553, 556; *Fassett v. Fassett*, 143 Md. 35, 41, 42, 121 A. 859.

In this case, apart from Schriver's admissions to his wife and her two sisters, the other evidence, standing alone, does not prove adultery. Though not sufficient in itself to prove adultery, it may nevertheless furnish corroboration of the wife's testimony and of other evidence of admissions of adultery. Suspicious circumstances may corroborate admissions which justify suspicion.

Schriver says that when he made the statement in the next to last paragraph in his letter of January, 1943, from the Pittsburgh hospital, he had no reason "to make any reference to any other women." He "signed that statement for one purpose, * * * to effect a reconciliation." He seems to imply that he signed it regardless of whether it was true. We think circumstances make clear the purport of the letter. His wife had left him, solely because of another woman. The letter was an admission of misconduct with the woman and an appeal for forgiveness. We cannot accept his denial of the truth of his own statements in the letter.

Nor can we accept his denial of his oral confessions. Both his wife and her sister testify to the confession of December, 1942. We do not think that confession was, or could have been, fabricated by them. It is consistent with the other confessions and with prior and subsequent conduct of Schriver and his wife. The promptness with which she left him on New Year's Day, and his apparent

acquiescence in her right to leave him, were not warranted solely by what she saw that day. This is also true of the separation of June 15, 1944. No effort seems to have been made on either occasion to persuade her of the truth of the explanation later given in evidence. We do not believe Schriver telephoned her to come to the office while the corespondent was there. But if he did, he must have foreseen the consequences and intended to precipitate a separation.

The story of Schriver's employment of the corespondent, uncontradicted except by its own inconsistencies and by Schriver's confessions, invites doubt. Their association, however innocent it may have been, was apparently not the result, but the cause, of any such employment. Schriver's own employees were not unwilling to work at night. Nor does it appear that they were "overloaded" with such work, or were any less available than Lazarus's employees for Schriver's work.

The "business purpose" of the Baltimore trip is not convincing. Taking dictation on the train, in a day coach, must require no little dexterity. It seems an odd way to give the girl "adequate work to do the next day," when she had her own job in Cumberland and took two days of her vacation to spend a dull evening in Baltimore. Nor does it appear how she learned so much and so soon, or what was the use of such knowledge, about an estate that had been in the Orphans' Court six years and was to be there two years longer before the first account was filed. An income tax conference usually involves some point—not "a complete audit" of the taxpayer's affairs for year's back. This conference was not urgent enough to require attendance of Mr. Ryan or any lawyer or accountant. It would seem that the girl might safely have been spared a trip to Baltimore to take dictation that was not written up or to wait for a telephone call that never came.

The lower court held that the husband's conduct, including "his association with the alleged paramour," constitutes cruelty, and that the separation on June 15, 1944,

"was brought about by his acts of cruelty and excessively vicious conduct," and that therefore it was unnecessary "to consider and decide upon the allegations of adultery" in the amended bill. The court, however, said: "As to the charges of infidelity made by the complainant against her husband, the Court is convinced that these charges were made as a result of the confessions alleged to have been made by the defendant to the complainant herself and also to her sisters, and also from many other circumstances mentioned in the record. As we have stated, the defendant upon the witness stand denied these confessions; but the evidence that he made them is corroborated and cannot be lightly ignored." From these statements we understand the court found that Schriver made the alleged confessions, but did not decide whether or not they were true.

We find that Schriver made the confessions and that they were true—at least that he was guilty of adultery. This is a suit against Schriver alone, not against the "corespondent"; his confessions would not be admissible against her. Even if he had used her to conceal a real paramour, his wife would be none the less entitled to a divorce. *Robinson v. Robinson*, 1 Sw. & Tr. 362, 380. We suggest no such possibility. The possibility of error is, however, inherent in cases of alleged adultery. As has often been said in such cases, if a man and woman create the appearance of guilt when guilt does not exist, they have only themselves to thank.

There is no evidence of adultery since the reconciliation in March, 1943. Previous adultery was condoned by cohabitation since the reconciliation. Condonation was, however, conditioned upon Schriver's express promise not to see the corespondent again and an implied promise to treat his wife with conjugal kindness. The offense condoned was revived by breach of these promises. *Hilbert v. Hilbert*, 168 Md. 364, 372, 373, 177 A. 914. Flaunting the girl in his wife's face was a breach of both promises. His previous conduct, though it may fall short of cruelty, falls still further short of conjugal kindness.

Since the wife was therefore entitled to a divorce *a vinculo*, she was likewise entitled to separate maintenance.

The amount awarded the wife for support of herself and the children is the amount specified in the separation agreement of January 19, 1943. No less is needed now. Nor does it appear that Schriver is unable to pay. He says his net income, less taxes, is only $260 a month; this statement is not adequately explained or supported. On this point we affirm the action of the lower court. That court will have the same right and power (no more, no less) to modify this allowance, as if this appeal had not been taken.

The decree of the lower court refers to the court's opinion. The decree is affirmed for the somewhat different reasons stated in this opinion.

*Decree affirmed, with costs.*