## BENTON *v.* BENTON

[No. 107, October Term, 1950.]

*Decided March 15, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*I. Duke Avnet* and *Herman Shapiro* for appellant.

*L. Awalt Weller,* with whom was *Ralph G. Hoffman* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Daniel R. Benton, appellant, from a decree granting his wife, Frances I. Benton, appellee, a divorce *a mensa et thoro* from the appellant, awarding the custody and guardianship of the infant child of the parties to the appellee, and ordering the appellant to pay by way of alimony for the appellee and for the support of the infant child, the sum of $15.00 per week, and costs of suit.

These parties were married on August 30, 1946, and voluntarily lived separate and apart at the homes of their respective parents until November 1, 1946, when they moved to a furnished apartment on West North Avenue in Baltimore. At the argument of the case in this Court it was stated that the appellant, at the time of marriage, was seventeen years old and the appellee eighteen years of age. In May of 1947, the wife being approximately five months pregnant, the appellant persuaded the appellee that they give up the North Avenue apartment and go to live with his father and mother on Edmondson Avenue and at that time he promised his wife that as soon as the baby was born they would get an apartment

of their own where they could keep house. While residing on Edmondson Avenue with the appellant's parents, the parties to this suit occupied a basement apartment consisting of a bedroom and kitchen. The wife testified that she had difficulty in living with his father and mother. He admitted that his wife complained to him about living in his parents' home. He said: "She didn't have to complain to me, I wasn't satisfied myself. Any married people, especially when you have a child, would want to be alone." The child was born October 23, 1947, and the wife thereafter demanded a home separate and apart from her husband's parents. She testified that pursuant to his promise they would get a separate place to live as soon as the child was born, she went around looking for an apartment and, regardless of where it was and what she found, he complained that it was too large or it was not good enough for him. When he would not get her a separate place to live, she told him that she was going to leave and if he found a decent place she would be glad to come back.

On June 15, 1948, she left the home of her husband's parents, taking the child with her, and went to live with her parents at Westminster, Maryland. He said at that time he was employed as a baker's helper and the reason he did not get a separate apartment following the birth of the child as he had agreed to do, was as follows: "I was making $36.00 a week take home pay. We had two rooms of furniture and when you get an unfurnished apartment you need a lot of things. I had two rooms of furniture, a refrigerator, a radio and I still had to pay installment bills on the refrigerator and the radio. We had to have a bedroom suite for us to go into an unfurnished apartment. I couldn't get along with less than $40.00 a week and I had to get this other furniture and pay the installment bills." He sent his wife eight dollars a week for the support of the child.

About July 6th, 1948, the husband sold all the furniture, which his wife had helped purchase with money she had earned, and took the money from the sale of the

furniture and bought an automobile for himself. The following Christmas, she came from Westminster to Baltimore to his aunt's house and called her husband on the telephone. He went to see her and told her he had found a furnished apartment on West Lexington Street. He took her over to see it and she agreed that it was a "nice apartment". She liked it very much but said that she wanted to continue working at the Westminster Shoe Company until the first of the year and save money to purchase pots and pans, cooking utensils and other things needed, which were not furnished with the apartment. After New Year's Day he called his wife and told her he was going to give up the apartment. She told him not to give it up until he came to see her. He went to Westminster and she asked him why he was going to give it up and he said he could not afford it. She said: "I wanted to make up some kind of thing so we could plan on keeping it up, and my father offered me hog's meat. He was butchering hogs and he offered me hog's meat and potatoes and I figured that would last for awhile, but he insisted he would give it up." The husband paid the rent on the apartment at the rate of $12.00 per week from December 10th, 1948, through January 14th, 1949. He admitted that he gave up the apartment at that time because he could not afford to pay the rent. He continued to live with his parents and the wife continued to live at her parents' home at Westminster. At the time of the trial in this case, the husband was employed as an organizer for the "Baker's Union, A.F.L. Local No. 68" and his "take home pay is $68.53." Although the suit brought by the wife was for a divorce *a vinculo matrimonii,* the chancellor found that although there had been a separation, the proof did not show an intent by the husband to desert and terminate the marriage relation until January 14, 1949, when he gave up the apartment on West Lexington Street. As the abandonment had not continued for the statutory period sufficient to warrant a divorce *a vinculo matrimonii,* the chancellor granted a divorce *a mensa et thoro.*

It appears from the record in this case that there would have been no objection on the part of the husband to a divorce and the payment of $8.00 per week for the support of the child, had alimony not been decreed. The real dispute seems to center around the fact that under the decree he is in effect required to pay $7.00 a week as alimony. As to most of the facts in this case there is little dispute. Both parties admit that when they gave up the apartment in November, 1946, it was at the husband's suggestion that they do it to save money. It is not disputed that he promised his wife that after the child was born a separate home would be set up. It is not disputed that conditions at the parents' home were not pleasant. Although the husband claims he did not have enough money to rent an apartment, it is admitted that within three weeks after his wife went to Westminster he sold all the furniture, in which his wife had a part interest, and with that money bought an automobile for himself, the wife says at a price of $1,100.00. It is difficult to understand why he could not have rented a furnished apartment with that money. It is admitted that when he asked her to come back in December, 1948, she said she wanted to work until New Year's to earn some money to buy pots, pans and cooking utensils. It is not disputed that the wife agreed to come back after New Year's. When she did not come back, on January 14, 1949, the husband gave up the apartment and told her he could not afford it. The wife seriously objected to his release of that apartment.

As pointed out in the case of *Coleman v. Coleman,* 188 Md. 203, 207, 51 A. 2d 673, as a ground for divorce *a mensa et thoro,* abandonment and desertion contain two inherent elements; namely, cohabitation ended and intention to desert. These two elements need not be identical as to the time of their commencement. *Hubbard v. Hubbard,* 127 Md. 617, 620, 621, 96 A. 860; *Dunnigan v. Dunnigan,* 182 Md. 47, 31 A. 2d 634; *Coleman v. Coleman, supra.* Separation had continued for sometime. We agree with the chancellor that the proof

shows an intent on the husband's part to terminate the marriage relation on January 14, 1949, when he gave up the apartment on West Lexington Street.

The husband testified that the wife repeatedly for long periods of time refused to have sexual relations with him. She admits this and said: "I can't help it. I begged him to take me to the doctor but he woundn't do it." She further testified: "I begged him to take me to the doctor, but he wouldn't do it, because that is all he worried about was his money, money, money. He never cared about anybody else but himself. I had a girl friend that was the same way and her husband took her down" to see a doctor "and he gave her needles and that helped her. We were sitting in the living room when we talked about that, and I even told him about that and he would listen but that is all." On the other hand, the husband said that he wanted to take her to a doctor and tried to talk to her about it and she would laugh in his face and everytime he brought up the subject she "just laughed in his face."

The law is well settled in this State that if a husband's or wife's conduct toward the other is always "kind, affectionate and above reproach" and the other for an unreasonable period of time, without just cause or reason, refuses sexual intercourse, the one so refusing must be regarded as having abandoned the other. *Wysocki v. Wysocki*, 185 Md. 38, 41, 42 A. 2d 909, and cases there cited. However, here the wife presents a reason why she would not cohabit. She claims it was on account of some condition which might have been corrected by a physician, and that she asked her husband to take her to a doctor to see whether this condition could be corrected. The appellant strenuously contends there is no corroboration of the wife's testimony on this phase of the case. In *Kelsey v. Kelsey*, 186 Md. 324, 327, 46 A. 2d 627, it was pointed out that the matter of corroborating testimony as to unjustifiable refusal to carry out marital relations is likely to be quite difficult in most instances. In that case the following was quoted from

the case of *Haskell v. Haskell,* 99 N. J. Eq. 399, 131 A. 876, 877: "They are guarded and surrounded with the greatest secrecy and regarded as sacred. A man and his wife are not likely to approach each other in such matters through third persons, not even through members of the other's family, nor through their family physician." Consequently, surrounding circumstances, as evidenced by the testimony of witnesses as to the mental and physical conditions, may be sufficient to supply the corroboration. The mother of the appellant testified that the appellee lived with her for thirteen months and that the appellee had a terrible cough and she was really concerned about her health. Furthermore, the fact that the appellee offered and expected to return to her husband in January, 1949, is strong evidence she did not consider that the marriage relation could not be fully resumed.

The chancellor here had the atmosphere of the trial which is invaluable in reaching a correct conclusion in this type of case. Of course, the atmosphere is reflected to some degree in the record. However, the opportunity of observing the appearance and demeanor of the witnesses and their manner of testifying is denied to us but given the chancellor. Therefore, his findings of fact, except in cases where they are clearly contrary to the weight of the evidence, should not be disturbed by us. *Mariani v. Mariani,* 189 Md. 283, 289, 55 A. 2d 713; *Reicher v. Reicher,* 196 Md. 494, 498, 499, 77 A. 2d 7, 9.

*Decree affirmed, with costs.*