## GRUBB *v.* GRUBB

[No. 205, October Term, 1951.]

*Decided July 15, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Samuel J. Fisher* and *Allan H. Fisher, Jr.,* for appellant.

*E. Paul Mason, Jr.,* for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree granting a divorce *a mensa et thoro* to a wife, ordering the payment of $50 per week as permanent alimony, subject to further order of court, and $500 as counsel fee to the wife's solicitor, and dismissing the husband's cross-bill.

The parties were married on May 27, 1950; the separation occurred on June 30, 1951 and there were no children born as a result of the marriage. Both were about forty years old at the time of the marriage. Dr. Grubb is a pediatrician and a graduate of the Johns Hopkins Medical School. He lived in an apartment at 4 Upland Road with his mother, who was over sixty-five years of age, and his aunt. He met the appellee about five years before the marriage. She was employed as a secretary to Dr.

McLanahan, at a salary of $50 per week. She was a not infrequent visitor at the house, and went to movies, and on at least one vacation trip with Dr. Grubb and his mother. After the death of the aunt, the parties became engaged in December, 1949, and it was understood that his mother would live with them in the apartment. After the marriage in May and their return from a two-week's honeymoon, disagreements arose between the wife and the husband's mother concerning the management of the household, which the wife assumed, and the *status* of the wife in the household. Dr. Grubb had always lived with his mother and had to be careful of his health, due to the removal of a tubercular kidney. He had few social contacts or interests outside of his profession. The wife's entrance into the household apparently disturbed the pattern of their life. Unfortunately, the husband, if he did not take sides with the mother, certainly did not side with the wife in these altercations. For example, when an issue arose as to who should do the marketing, he simply left the market money on the table and went out. Again, when the wife complained about the mother's faultfinding, dominating ways, and coldness to her, he told her that she should be more tolerant, that these "were trivial problems in the main, that I knew my mother well, I knew she had a very forgiving spirit". On several occasions the mother refused to allow the wife to enter their bedroom, on the ground that the husband was resting and should not be disturbed. When the wife complained of these and other incidents he stated that he thought these small matters could "be straightened out without my coming in to act as a referee". He refused to adopt her suggestion that they have a joint conference with the mother, or with the minister who had married them. This policy of neutrality did not succeed in relieving the tension, which according to the undisputed medical testimony began to seriously affect the wife's health.

In June, 1951, about a year after the marriage, the wife, with her husband's consent, went to her mother's

home for two weeks when the latter's maid was on a vacation. She never returned. According to her testimony, she sought an interview with her husband, told him that she loved him, and begged him to establish a separate home for her apart from the mother. He refused, and told her that he did not love her any more and did not want her to come back. He denied that he ever told her not to come back, but admitted that he never asked her to do so. When asked if he told his wife that he no longer loved her, he testified: "the conversation as I recall it involved a demand on my wife's part that I say yes or no, and without equivocation or hedging, did I, or did I not love her. I told her we had been through a very, very tense situation and that under the present circumstances I certainly did not feel towards her in the manner that I had before. However, that under certain circumstances I did not know how I would feel. When my wife said: 'Do you want me to come home?' I gave the same answer which I have given to the court up to this point, and I said: 'Things are so tense tonight that I do not think I would come tonight'. My wife had not been home for a month. She was living at her mother's home. I said: 'I would not come home tonight', but I did not tell her not to come home."

The appellant strongly urges that the wife was fully aware of the situation when she married Dr. Grubb, that she had been intimate with the mother for five years and knew she would have to live in the household with the mother and put up with the friction that might naturally be expected. He argues that the various incidents described were so trivial as to fall into the pattern of our decisions in *Buckner v. Buckner,* 118 Md. 101, 84 A. 156, *Ewing v. Ewing,* 154 Md. 84, 140 A. 37, and *McClees v. McClees,* 160 Md. 115, 152 A. 901. The appellee, on the other hand, relies upon the cases of *Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455, *Benton v. Benton,* 197 Md. 373, 79 A. 2d 146, and *Zimmerman v. Zimmerman,* 199 Md. 176, 85 A. 2d 802. We find it unnecessary to review these decisions or to decide whether

the mother's conduct could properly be held to be so outrageous as to justify the wife in demanding a separate home. We think the testimony clearly shows that the wife had no intention of terminating the marriage when she left the house, and her failure to return was due primarily to the husband's attitude. As stated by the chancellor "he chose not to interfere, and he chose to consider the duty that he owed to his mother as paramount to the obligation that he owed to his wife". Moreover, Dr. Grubb indicated rather clearly that he had lost all affection for his wife and did not want her to return. She could hardly be blamed for not forcing herself on her husband under the circumstances. In short, it was the refusal of the husband to discuss reconciliation, or to make any real effort to save the marriage, rather than the wife's demand for a separate home, that made the separation final. On questions of credibility and good faith the chancellor's findings are entitled to great weight. We think the chancellor's finding of constructive desertion on the husband's part is supported by the evidence.

The appellant contends that the chancellor erred in awarding alimony and counsel fee under the circumstances. The husband seems to have a large and lucrative practice. His net income for 1951 was in excess of $13,000, after a deduction of about $9,000 for business expenses. His mother had a pension of $100 a month. The wife was impecunious and unemployed at the time of the trial, but the chancellor stated that in arriving at the award of $50 a week, subject to the further order of court, "I have taken into consideration the fact that the complainant will in all probability secure employment in the near future, and that she is at present physically able to become employed." We find no error in the allowance, or in the award of counsel fee under the circumstances. It is conceded that the amount of the fee was not excessive.

*Decree affirmed, with costs.*