REICHER *v.* REICHER
SUMMERFIELD (REICHER) *v.* REICHER
(Two Appeals in Separate Records)

[Nos. 39-40, October Term, 1950.]

*Decided December 7, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Irving S. Reamer*, with whom was *Meyer Reamer* on the brief, for the appellant.

*Bernard M. Goldstein* for the appellee.

COLLINS, J., delivered the opinion of the Court.

Here are two appeals by Anna F. Reicher. One is from a decree granting to the appellee, Harry Reicher, a divorce *a mensa et thoro* on the grounds of desertion on a bill of complaint filed by him on October 11, 1949. The other is an appeal from a judgment rendered, by the trial judge without a jury, in favor of Harry Reicher in a suit at law filed against him by the appellant on July 13, 1949.

The parties to this suit, both of whom had had children by former marriages, first met in August, 1948. He had been a roomer in her home. They were married three months later and continued to live in her home. She says that he was very attentive to her before the marriage and gave her several valuable presents and pressed for an early wedding. She claims that a few days prior to

the marriage appellee approached her for a loan for the purchase of Christmas merchandise for his haberdashery store, to be repaid immediately after Christmas. The daughter and mother of the appellee also state that this $2,115.16 advanced by the appellant to the appellee was a loan to be repaid after Christmas. This is the amount for which she entered suit against the appellee at law. The appellant borrowed $2,000.00 of this money on her life insurance policy and the balance of $115.16 was her salary check. As the appellant had a position at Fort Meade and was required to stay there during the week, these parties lived together only over weekends. The appellant says that after the marriage the appellee slapped her on two occasions and pushed her once. She claims that without her knowledge he collected rents from other apartments in the house in which these parties lived, and which belonged to her, amounting to $168.00 per month and also compelled her to turn over to him her salary checks. She further states that on Friday evening, January 21st, 1949, when she returned from her work at Fort Meade for the weekend, she, the appellee and her mother went to her daughter's home for supper. There the appellee demanded her salary check. When she said that she would not give the monthly check to him again, he flew into a rage, threatened to send her to the hospital and slapped her. This is corroborated by her daughter and her mother. The appellant's daughter immediately ordered the appellee from her home. The record does not show where he spent that night. The following day, in a telephone conversation, the appellee was told not to come to her house again. Later that day, with his son, he went to the home and found the appellant there with her family and with her attorney. He was ordered out of the house by his wife and her attorney. He took some of his clothes and left. He returned to her house the next day with another son and his son-in-law and took away his remaining clothes. He says at that time his wife told him that he could not stay there. The parties have not lived together since.

Several months later the appellee heard that appellant had had an accident. He says he called her and asked whether he could see her. She replied that he could see her if he would bring her her sun glasses. He said he then took her the sun glasses and asked her "about getting together". She then laughed at him and said: "You will have to build me a bungalow". Later, appellee's son came to see appellant and asked her whether there was any chance of a reconciliation. She admits that she told him "a reconciliation was impossible". Appellee denies he ever slapped her or collected the rents from her house. He says she never gave him her salary checks. These were deposited in their joint account. Appellee said: "Your Honor, every time I asked her to stay home she said, 'I made a mistake in the whole marriage, I thought you had more money than that.' I said, 'I told you I am a poor man, I haven't got anything; as much as I got, I cashed my bonds and helped you fix that furniture up.' She said, 'You aren't the type of man I want to marry anyway, you are too doggone dumb, you are a greenhorn, you don't know how to write and read.' I said, 'No, I don't know how to write and read, but I am honest enough to help you out with a home and stay home.' She said, 'Nothing doing, we have to make some kind of an arrangement to get this separation.' I said, 'Why did you take all that stuff away from me, now I haven't got no money, I am trying to make a living for you, it costs me $45 a week to live and I have no home.' She said, 'You don't know how to act, you don't know how to sit down and talk to people, you don't know enough English to talk to people.' I said, 'You didn't find that out before.' "

It has been stated many times by this Court that the atmosphere of the trial is invaluable in reaching a correct conclusion. As was said in *McClees v. McClees*, 160 Md. 115, at page 119, 152 A. 901, at page 902: "The record presents a case in which, as has been many times said by this court, the atmosphere of the trial is invaluable in reaching a correct and just conclusion.

This atmosphere is reflected, to a degree, in the record; but the appearance and demeanor of the witnesses, and their manner of testifying, the chancellor had the benefit of, while it is denied to us. For this reason we are not at liberty to disturb the chancellor's findings of fact except in cases where they are clearly contrary to the weight of the evidence." *Collins v. Collins*, 184 Md. 655, 663, 42 A. 2d 680; *Mariani v. Mariani*, 189 Md. 283, 289, 55 A. 2d 713, and cases there cited; *Buttion v. Buttion*, 189 Md. 305, 311, 55 A. 2d 839; *Smith v. Smith*, 196 Md. 219, 76 A. 2d 160.

The finding of the chancellor, under appellant's own testimony, was that the slaps did not cause the separation. He found as a fact that arguments about money caused the appellant to order the appellee from the home. We cannot say in this case that the chancellor's finding of fact was clearly contrary to the weight of the evidence.

It has been often stated by this Court, that no conduct will justify separation unless it is such as would render it impossible to continue the matrimonial cohabitation with safety, health and self-respect. *Schwartz v. Schwartz*, 158 Md. 80, 90, 148 A. 259; *Bradshaw v. Bradshaw*, 189 Md. 322, 324, 325, 55 A. 2d 719. Arguments over money have never been considered by this Court to be conduct such as would render it impossible to continue the matrimonial cohabitation "with safety, health and self-respect." The decree for a divorce *a mensa et thoro* will be affirmed.

Some of the judges of this court are inclined to think that the husband was no less at fault than the wife, that neither made any marked effort to preserve this marriage and that this case is like the many cases in which we have held that divorces should not be granted for light and trivial causes and have left the parties where they placed themselves. However, we all agree that these are matters which can better be determined by the chancellor than by us.

The suit at law for the $2,115.16 was filed by the appellant before the appellee filed his suit for divorce.

Appellee denies that this was a loan or used to purchase merchandise for his store. This amount was deposited in a bank in the joint names of the appellant and the appellee. None of the checks on this account shows that this money was used to purchase merchandise for the store. The appellee contends that this was deposited for the purpose of buying furniture and household effects. It appears from the evidence that from this joint account at least $2,100.00 was spent for furnishings in the house. The trial judge found that at least $2,000.00 was spent from the joint account in the household. Except for appellant's statement there is nothing to show that any of this money was used to buy stock for appellee's store. The appellee also purchased for the appellant a marriage ring, a watch with a bracelet, a diamond ring and other jewelry at a cost of approximately $1,425.00 He also gave her, before the marriage, $300.00 to purchase clothes. After the marriage he purchased a fur coat for her. In finding a judgment for the appellee, the trial judge ruled that the jewelry and fur coat should be kept by the appellant. The furnishings are in her home. The judgment will be affirmed.

The law case was heard at the same time as the divorce case and testimony taken was considered as the testimony in both cases. The trial judge ordered the appellee to pay the costs below.

*Decree affirmed, costs to be paid by the appellee.*

*Judgment affirmed, costs in this Court to be paid by the appellant.*