SHOOK *v.* SHOOK ET AL.

[No. 216, October Term, 1956.]

*Decided June 7, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and KINTNER, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*John J. Bishop, Jr.,* with whom were *Buchanan & Bishop* and *William R. Buchanan* on the brief, for appellant.

*Benjamin B. Rosenstock,* with whom was *E. Austin James* on the brief, for appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree declaring two bank accounts to be held under a constructive trust.

Charles E. Shook died on August 9, 1953, survived by three children, George E. Shook, respondent and appellant here, Denver J. Shook and Mildred N. Shafer, complainants and appellees here, and the heirs at law of a deceased daughter, Florence C. Rufner. At the time of his death he had two accounts in the Fredericktown Savings Institution in Frederick, Maryland, one being a checking account in the amount of $800.83, and the other a savings account in the amount of $2,613.26. These accounts were originally opened in the name of Charles E. Shook. On June 9, 1953, two months before his death, Charles changed these accounts to read "Charles E. Shook, in trust for himself and George E. Shook, joint owners subject to the check of either, balance at death of either to belong to the survivor."

On May 10, 1955, Denver J. Shook and Mildred N. Shafer, as complainants, filed a bill of complaint against George E.

Shook, as respondent, in the Circuit Court for Frederick County in which they made the following allegations. Charles was the father of all the parties to the cause. In order to expedite the settlement of his affairs after his death, he being then seventy-five years of age, he consulted with members of his family and close friends about the most expeditious way of so doing. Thereafter, in June, 1953, he caused to be opened at the Fredericktown Savings Institution a savings account and also a checking account in his own name and that of the respondent with the provisions that the survivor therein named should receive the funds in said account. The said deposits were made in trust and confidence, nevertheless, that after the payment of all funeral expenses and debts due by the decedent, the respondent would distribute the remaining funds among the three surviving children of Charles, namely, the complainants and respondent therein, share and share alike. Charles E. Shook died intestate on August 9, 1953, leaving the parties to this cause as his sole heirs at law. The complainants have made demand upon the respondent for an accounting of said funds, which demand has been refused. In carrying out the orderly disposition of his affairs Charles caused a 1951 Chrysler automobile to be titled in the name of Denver, one of the complainants, and an insurance policy in the amount of $225.00 issued by the Metropolitan Life Insurance Company to be made payable to Mildred N. Shafer, the other complainant, all of which assets, including $90.00 derived from the sale of a set of tools, have been offered by the complainants and do hereby proffer to be brought into court to be divided equally among the parties hereto. The bill prayed, among other things, that the said bank accounts be declared to be a trust fund, held by the respondent for the benefit of all the parties thereto; that a trustee be appointed to take charge of all assets of said decedent and distribute the same in accordance with such decree as may be passed therein. Apparently the solicitor who drew this bill did not know of the deceased daughter, Florence C. Rufner.

After answer was filed, testimony was taken in open court before the chancellor on December 20, 1955. He passed a decree ordering that the bank accounts, the Chrysler auto-

mobile, the $225.00 and the $90.00, all aforesaid, be and the same are declared to be held by the several parties under a constructive trust. He appointed trustees for the purpose of collecting, disposing of and paying, or properly accounting for necessary expenses, and distributing the assets of said constructive trust for the use and benefit of the parties thereto and the heirs at law of Florence C. Rufner, being all the heirs at law of Charles. From that decree respondent appeals here.

The Maryland law is well established that a bank account in the form here made, if unexplained, indicates an intention to create a trust, and without further explanation, said bank accounts would pass to George E. Shook. It is immaterial whether the fact of the deposit is communicated to the beneficiary or not. *Milholland v. Whalen,* 89 Md. 212, 43 A. 43. However, the entry may be explained and the intention indicated may be rebutted. It is always open to the executor or administrator of the decedent or the parties in interest to show that the purpose of the declaration of trust was not what it, in form, appeared to be. The rebuttable presumption is that created by the execution of the transfer, and the burden of proof is on those seeking to rebut such presumption. *Ragan v. Kelly,* 180 Md. 324, 24 A. 2d 289; *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 46 A. 2d 284; *Hancock v. Savings Bank of Baltimore,* 199 Md. 163, 85 A. 2d 770; *Bierau v. Bohemian Bldg., etc., Ass'n,* 205 Md. 456, 461, 462, 109 A. 2d 120; *Tribull v. Tribull,* 208 Md. 490, 507, 119 A. 2d 399.

Mr. F. Ross Myers, President of Fredericktown Savings Institution, testified that the above accounts were closed by George on September 21, 1953. Denver J. Shook, one of the complainants, testified that he knew about his father changing the bank accounts. His father talked to him in the presence of Mr. Harry Young on June 9, 1953, on a street corner in Frederick about this. His father lived with his sister, Mrs. Shafer, before he died. His father and mother moved into the home of Mrs. Shafer more than twenty years before his father's death and his mother died at her home. His father never lived with him or with George. He had

a heart attack in April, 1953, and did not do any work after that time. He had another heart attack on July 31, 1953, was taken to the hospital, and died on August 9th. The tools were gathered together by him, George and Mrs. Shafer and sold for about $90.00 and Mrs. Shafer was advised by her brothers to keep the money until everything was straightened out. The day after his father was buried the three children were to meet at the bank. George arrived late and when he came he said he had been at the Farmers and Mechanics Bank because he thought his father had his money there. George at that time wanted to advance money to Mrs. Shafer for a trip to Chicago, but was advised by the bank president that he would be required to give thirty days' notice before withdrawing the money. Mrs. Shafer turned the bank books over to George that day and all agreed to meet at the bank later. George at that meeting stated that he knew his father wanted the money divided equally among the three and he was "going to do what was right". Mrs. Shafer agreed to bring in the insurance check and the tool money, to be given to Mr. Myers, to divide between the three of them. George paid the inheritance tax, the hospital and funeral bills. George said he thought maybe his father had left a paper, a will, and he wanted to investigate that. George then made an appointment to meet his brother and sister at the bank to divide the money. He did not appear. They drove out to his home and they heard George's wife tell him to let them go back to town, the money was in his name and he should keep it. George later told them there might be a paper, a will. Denver was very close to his father and saw him every day. He lived near his sister with whom his father resided. George never did anything especially for his father, beyond what was done for him by himself and Mrs. Shafer. His father had built a house for George and he still owed him money for that.

Mrs. Shafer testified that her father lived with her for twenty-three years. Denver lived within a block of her and came to see his father very often. Her father told her that the bank books were in the bureau drawer and she took them to the bank with her. When they arrived George said he did

not know his father had his name on the books until then. George told them he did not want one cent more than Denver and her, because his father wanted it that way, and he would pay the bills. She corroborated Denver's testimony as to the various meetings with George. When they went to George's home on the time mentioned by Denver, George's wife was "awful mad" and she heard her say there was nothing to divide, that the money was left to George.

Mr. Harry A. Young, a witness for the complainants, testified that he had known Charles very well for forty years. About June 9, 1953, Charles, Denver and he happened to meet on a corner in Frederick. When asked what Charles told him, he replied that Charles said the doctor had advised him not to go up and down steps. George had a bungalow and he supposed he would have to go out there to live. He was going to the bank to make arrangements to turn his money over to George so that he could pay all the bills, without extra work for the other two children. He was satisfied that after George paid the bills he would divide the remainder equally with the other children. Mr. Walter T. Dunbar, a witness for the complainants and a life insurance agent in Frederick, testified that Charles was working at his home during the year 1953 and told him that he really did not have to work. He did not need the money but he wanted to leave some more money to his children by doing extra work.

Mrs. Amon Burgee, a witness for the complainants, testified that she was the mother-in-law of Denver and knew Charles during his lifetime. She heard him say on two or three occasions that he would like Denver to settle up the estate as he was the oldest, and he wanted them to get it all, share and share alike. Miss Ella Lee, a nurse, testified for the complainants that she lived in Denver's home. Denver's father discussed his affairs with her several times, the last time being a week before he was taken sick. Charles had done some work for Denver, and Denver wanted to pay him but he would not take the money but said he wanted to treat him like the other children. He had built a house for George and charged him nothing, and he wanted to do the

same for all three children. Mrs. Denver Shook testified that in the last year of his life she heard Charles say that after he was dead he wanted the money equally divided among the three children.

Mr. Charles H. Fraley, the father-in-law of George, called by the respondent, testified that he saw Charles Shook a short time before his death at George's home and he told him he was going to look after George, as he had never given him any trouble, and that he had never done anything for him except build his house. Mr. William Z. Renn, called by the respondent, a restaurant owner in Frederick, testified that he had known Charles very well, and saw him every week. Charles told him he wanted George to have every nickel he had because he had always looked after him and been good to him. He had taken steps at the bank to do this. Charles said he helped Denver when he ran for sheriff, and had looked after Mrs. Shafer for a long time and taken care of her, and thought the thing to do was to take care of George and he wanted him to have everything he had. He admitted that when George, Denver and Mrs. Shafer came to see him to ask if he had any "paper" from Charles, he did not tell them anything about this conversation he had had with Charles. George E. Shook, Jr., testified that his father met with Denver and Mrs. Shafer outside the bank the day after the funeral. His father told Denver that if he could prove the money should be divided three ways he would gladly do it, but he felt that as the money was left in his name he should have it. He heard his mother tell his father that he did not have to split the money, it was in his name and he was entitled to it.

George E. Shook, respondent, testified that the day of the funeral his brother and sister asked him to go to the bank the next morning. He did not know where the money was. He did not know the bank books were in his and his father's names until he went to the bank the day after the funeral. At the bank Mr. Myers told him "Your Dad must have thought a lot of you to let you have this money." He did not see the bank books until two weeks later. At that time, at the request of Mr. Myers, the bank books were turned over to him, George, by Mrs. Shafer. He paid the funeral expenses, doctor's and hospital bills, and other expenses out of

the checking account. Denver got the title to the Chrysler in his own name. Although the car had been sold to him, George, he had not paid for it because the title was held by Denver. When his brother and sister came to his house he told them the money was his and "that was the way it was supposed to be". They told him they would "see" about that. He never made any promise to his brother and sister. He never agreed to divide the money equally with them. When asked why he paid the bills when the money was in his and his father's names, he said he did this because it was his father's money.

Mrs. Sadie Stottlemeyer, called by the respondent, testified at a resumed hearing on November 6, 1956, that she had known Charles for many years. He came to her home on June 9, 1953, and said he had had a busy day, he had been at the bank and changed everything. "I have done plenty for them all and when my eyes are closed theirs will be open; they will have to learn the hard way." She said he "took his hand that way (indicating)—'Them down there will have to learn the hard way.'" He did not mention any names. On another occasion he told her "he had changed everything and the books would show who was to get everything". He also told her he was worried about George because of his bad leg. He was afraid he would not be able to work. He said: "I'll see he is taken care of—George has never given me no trouble in no way, shape or form, and I'll see to him." She further said that at one time she suggested he give the car to Julian (not identified). He replied: "No—if I can't give all one I won't give one and not all of them."

Although there was a presumption by the words used in the bank account that the money belonged to the survivor, George, the chancellor, in finding for the complainants, was of the opinion that the evidence was sufficient to overcome that presumption and sufficient to justify the decree. He saw and heard the witnesses. He had the atmosphere of the trial, the appearance and the demeanor of the witnesses before him, and their manner of testifying. This is denied to us. We cannot say that the chancellor's finding of fact was clearly contrary to the weight of the evidence. In matters of credi-

bility, the chancellor's findings are entitled to great weight and we cannot disturb those findings of fact except in cases clearly contrary to the weight of the evidence. *Reicher v. Reicher,* 196 Md. 494, 499, 77 A. 2d 7, and cases there cited; *Miller v. Miller,* 204 Md. 509, 512, 104 A. 2d 921; *Thurlow v. Thurlow,* 212 Md. 222, 229, 129 A. 2d 170.

At the end of the hearing on December 20, 1955, Mr. Walsh, the then solicitor for the respondent, stated to the chancellor that Mrs. Sadie Stottlemeyer had injured her hip and could not appear and he would like her to testify. The hearing was then adjourned and resumed on November 6, 1956, for the purpose of taking Mrs. Stottlemeyer's testimony. At that time solicitors Bowers and Offutt, newly employed by the respondent, and not his solicitor in this Court, requested the chancellor to permit them to produce additional witnesses. The chancellor stated that a stipulation had been made by Mr. Walsh, the former solicitor for the respondent, that he desired to take the testimony of Mrs. Stottlemeyer, who was then around eighty-seven years of age, and that he wanted to hear her testimony. The chancellor said that as to other testimony the counsel for complainants objected, and the chancellor would have to hold to the stipulation made by Mr. Walsh which was in the record and that as Mr. George Shook was present at the time Mr. Walsh made the statement, he could not go beyond that stipulation. The respondent's solicitor in this Court claims that the refusal of the chancellor to admit additional testimony was erroneous. Such action on the part of the chancellor is in his discretion and is not subject to review except where his action is arbitrary and the rights of some of the parties are improperly affected. *Bradford v. Eutaw Savings Bank, supra,* 131. No proffer was made by the respondent as to what these other witnesses, whom he desired to produce, would testify to on the stand. As stated by the chancellor, if attorneys were permitted continuously to bring in witnesses, a case would never be completed. We find no abuse of discretion under the circumstances. *Brown v. Bendix Aviation Corp.,* 187 Md. 613; 620, 621, 51 A. 2d 292; *Miller v. Miller, supra,* 513. The decree will be affirmed.

*Decree affirmed, with costs.*