BLAIR, EXECUTOR *v.* HAAS ET VIR.

[No. 41, September Term, 1957.]

*Decided December 18, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Murray MacNabb* for the appellant.

*Robert C. Prem,* with whom were *George S. Yost* and *Niles, Barton, Yost & Dankmeyer* on the brief, for the appellees.

BRUNE, C. J., delivered the opinion of the Court.

The question here involves the ownership of two joint bank accounts. The plaintiff-appellant is the executor of Mrs. Steva Hoyt, one of the parties named in these joint accounts. The defendants-appellees are Mrs. Margaret Haas, the other party thereto at the time of Mrs. Hoyt's death, and her husband, George Haas. The party beneficially interested in the success of the executor's claim to the funds is Mrs. Helen Jarusek. She and Mrs. Haas are the legatees of one-half each of the net estate of Mrs. Hoyt passing under her will. The Circuit Court of Baltimore City dismissed the executor's bill for accounting of monies withdrawn from these bank accounts by Mrs. Haas, and the executor appeals.

The decedent, Mrs. Hoyt, was married three times. Her third husband, whom she married in 1946, was Edward Hoyt, the father of Mrs. Haas. Mr. Hoyt's first wife was the mother of Mrs. Haas and a sister of the decedent, so that the relationship between the decedent and the defendant Margaret Haas was dual—Mrs. Steva Hoyt was both the aunt and the stepmother of Mrs. Haas. Mrs. Hoyt was also a half-sister of Mrs. Jarusek. Mr. Hoyt appears to have

been the principal source of the funds in the joint bank accounts here involved, part of the money having come from the sale of properties which he had owned or paid for, part from proceeds of insurance on his life, and some part from funds which Mrs. Hoyt received from, or through the estate of, her second husband, Mr. Sommers.

During the last six months of Mr. Sommers' life, he and the decedent lived with Mr. and Mrs. Jarusek; and the decedent continued to live with them after his death and for about four months prior to her marriage to Mr. Hoyt. After that marriage the Hoyts and Mr. and Mrs. Haas and Cheryl Haas, their daughter (now Mrs. Walter) all lived together in Mr. Hoyt's home on Fleet Street in Baltimore (except that Mr. Haas was away for about a year in military service) until 1951. In that year the Hoyts purchased a house at 6816 Gough Street in Baltimore, and Mr. and Mrs. Haas bought a house next door, No. 6818; and both the Hoyts and the Haases moved to their new homes. The decedent never had any children.

Both Mr. and Mrs. Hoyt suffered from illness while living on Gough Street. For a period beginning in 1953 and continuing until June, 1954, Mrs. Haas cooked meals for her sick stepmother and rendered other care and services to her, and Mr. Haas also helped to take care of her by administering hypodermic injections. Mrs. Hoyt had cancer and entered a nursing home in June, 1954. Mr. Hoyt, who was suffering from Parkinson's disease, shortly thereafter moved to the same nursing home so that they could be together. He died there on March 23, 1955.

On March 26, 1955, Mr. Henry D. Blair (Sr.) of the Baltimore bar, at the request of Mrs. Hoyt, which was transmitted by Mrs. Haas, visited Mrs. Hoyt at the nursing home with regard to drawing a will for Mrs. Hoyt. Mr. Blair was accompanied by his son, Mr. Henry D. Blair, Jr., also of the Baltimore bar and the executor under Mrs. Hoyt's will. (Both of the Blairs were named as executors, but Mr. Blair, Sr., renounced the appointment.) Mr. and Mrs. Haas were present during the visit of the Messrs. Blair to Mrs. Hoyt. During that visit Mr. Blair, Sr., dictated, and Mr. Blair, Jr.,

wrote out in longhand, a will for Mrs. Hoyt which she thereupon executed. It is substantially identical with the typewritten will which she executed on April 4, 1955; and the latter is her will which was admitted to probate.

There is no question as to the validity or construction of Mrs. Hoyt's will; the controversy is whether or not it is operative with regard to the joint bank accounts.

In the bill of complaint the executor sought to hold the Haases accountable for funds belonging to Mrs. Hoyt which were used in the summer of 1955 to pay off a mortgage on the home of Mr. and Mrs. Haas. The Chancellor found that funds so applied, which were probably in the neighborhood of $5,800, constituted an absolute gift; and any attack thereon appears to have been abandoned on appeal. Therefore, no more need be said about it. It may, however, also be noted that Mrs. Hoyt also made some gifts in very much smaller amounts to Mrs. Jarusek at about the same time.

On March 26, 1955, there was a joint savings account in The Equitable Trust Company (of Baltimore), entitled "Steva Hoyt in trust for self and Margaret Haas and Edward Hoyt joint owners, subject to the order of any one of them, balance at the death of one first dying to belong to the survivors in trust for each other, subject to the order of either of them, balance at death of either of said survivors to belong to the ultimate survivor." There was also a checking account in the same trust company in the names of Mrs. Margaret Haas and Mrs. Steva Hogt (sic), in which there was a balance of about $640 at that time. Mr. Blair said that he was not informed of the existence of this account. He seems to have thought that there were two joint savings accounts in existence on March 26, 1955; but his recollection would seem to have been faulty in this respect, since the second savings account was not opened until May 3, 1955. He was not informed as to any jewelry or as to a wrist watch owned by Mrs. Hoyt.

He testified that he advised Mrs. Hoyt that her will would not be effective as to the money in the joint savings accounts and that it was therefore agreed between Mrs. Hoyt and Mrs. Haas that the bank accounts should be put in Mrs. Hoyt's

name only, and that Mrs. Hoyt should execute a power of attorney which would enable Mrs. Haas to draw funds to pay Mrs. Hoyt's expenses. He drew the power of attorney, Mrs. Hoyt executed it on April 4, 1955 (which was also the date of execution of the typewritten will), and he had it recorded the next day and Mrs. Haas paid his fee for drawing it. He also testified that Mrs. Haas was disappointed by the provisions of the will, that he inquired of Mrs. Hoyt if she really wished her estate to go one-half to Mrs. Jarusek and one-half to Mrs. Haas, and that Mrs. Hoyt said that she did, that she loved them both equally.

No change was, however, made in the Equitable Trust joint savings account. The other joint savings account was opened with the St. James Savings Bank on May 3, 1955, with a nominal deposit of $1.00. The account is in the name of "Mrs. Steva Hoyt in trust for self and Mrs. Margaret Haas, joint owners, subject to the order of either, the balance at death of either to belong to the survivor." On June 20, 1955, a check for $8,013.25 was deposited in this account. Something over $7,000 of this amount probably represented the net proceeds of sale of the Gough Street house, which Mr. Blair had remitted to Mrs. Hoyt on June 15th. There was also a withdrawal on June 20th of $1,879.73 from the Equitable Trust joint savings account, which reduced the latter account to exactly $10,000.

The Equitable Trust joint savings account was established by Mr. Hoyt in 1946, and it remained in the exact form in which he established it until after Mrs. Hoyt's death. There was testimony that he set it up as he did in order to avoid having to make a will. The balance in this account on March 26, 1955, was $2,765.93. Interest of $16.30 was credited to the account on April 5, 1955. On April 12, 1955, $2,500 representing proceeds of insurance on Mr. Hoyt's life was deposited in the same account; and on April 18, 1955, a deposit, also apparently derived from insurance on Mr. Hoyt's life, was made of a little more than $10,000.

The joint checking account in The Equitable Trust Company showed a balance of about $640 on March 22, 1955, and two deposits aggregating $527.55 between that date and

April 1, 1955, and withdrawals aggregating $78.00 on March 29 and April 1, 1955. The balance on the latter date was a little over $1090. Mrs. Hoyt used this account during the spring and summer of 1955. A number of deposits were made and checks were drawn against the account, as appears from the bank statements. Most of the checks were to pay for Mrs. Hoyt's care at the nursing home, but two were payable to Mr. Blair's firm for services in drawing her will and in handling the settlement for the Gough Street property. A number of checks were put in evidence, all of which bore Mrs. Hoyt's signature.

During her stay at the nursing home Mrs. Hoyt kept her bank books in a box in a bureau drawer beside her bed. She received a number of visitors during her stay at the home, including the Jaruseks, the Haases, a Mr. Primus, whose wife was a full sister of Mrs. Hoyt and a half-sister of Mrs. Jarusek. She was also visited on various occasions by the Haases' daughter, Cheryl, who informed Mrs. Hoyt in April, 1955, of her engagement. When Mrs. Hoyt was informed of this and that Cheryl would be moving into her own home when she was married, Mrs. Hoyt said that she would like to go to live with Cheryl's mother, Mrs. Haas. In conversations with Mr. Primus and also with Cheryl, Mrs. Hoyt spoke of this plan, of her appreciation of what the Haases had done for her and of her desire to do something for them.

There is evidence indicating that Mrs. Hoyt expected to recover from her illness and to be able to leave the nursing home and go to her stepdaughter's home to live. However, in early September, 1955, she had to go to a hospital for an unexpected operation and died as a result thereof on September 6, 1955.

Mrs. Haas withdrew the balances in the two joint savings accounts and redeposited the funds in new accounts in the names of herself and her husband. These are the funds which the appellant now seeks to reach. The St. James account amounts to $8,014.25; that in the Equitable Trust to $4,134.00.

He asserts that the appellees cannot profit by the breach of Mrs. Haas' agreement to change the bank accounts into

Mrs. Hoyt's name, and that they cannot modify the terms of an executed will by parol evidence. The appellees contend that Mrs. Hoyt had a change of heart after the time when she executed her will and the power of attorney and that she wished Mrs. Haas to receive the balances in the bank accounts upon Mrs. Hoyt's death. They deny that evidence in support of this position has any effect upon the terms of the will and hence assert that it is not open to attack upon the second ground asserted by the appellant.

There were three separate hearings in this case in the Circuit Court. The Chancellor admitted some evidence at the first hearing which he later concluded was not admissible under Section 3 of Article 35 of the Code (1951), and he possibly restricted Mr. Blair's testimony to some extent. At the request of the appellant (probably made orally, since we find no written motion to that effect), he reopened the case, rejected the testimony which he thought had been improperly admitted, and permitted Mr. Blair, Sr. to testify fully with regard to the drawing of the will and conversations in connection therewith. At the conclusion of the second hearing the Chancellor stated his willingness to consider further testimony which the defendants might be able to offer; and on their petition and proffer, and over objection by the plaintiff, he heard further testimony produced by the defendants. At the conclusion of the entire case he delivered an oral opinion, to which we shall refer below.

The instant case is in part the converse of the usual confidential relations case in that, insofar as the Equitable Trust joint savings account as of April 4, 1955, is concerned, there was no transfer by the allegedly wronged party, but a failure to retransfer or relinquish the fund by the party alleged to have abused her position. As to the additions to the Equitable Trust account and as to all (except perhaps $1.00) of the St. James account, funds of the decedent were placed in the joint names of Mrs. Hoyt and Mrs. Haas in a usual trust form, and this involved a transfer by Mrs. Hoyt, since it was her funds which were deposited in these accounts. Whether the case should be regarded as involving an alleged breach of an express oral trust or as a breach of a fiduciary

duty arising from a confidential relationship, or as involving both, does not make much practical difference, since in this particular case both types of claims stand or fall on the same facts. We shall not attempt to make any distinction based upon possible differences of legal theory.

As in *Masius v. Wilson,* 213 Md. 259, 131 A. 2d 484, we shall assume, without, however, deciding that a confidential relationship existed between Mrs. Hoyt and Mrs. Haas, and that there is consequently a burden upon the latter to show that on the one hand, the transfers of new funds and, on the other hand, the relinquishment of any demand that Mrs. Haas put the Equitable Trust joint savings account in Mrs. Hoyt's name alone, were the deliberate and voluntary acts of Mrs. Hoyt, the donor, and that the transactions were fair, proper and reasonable under the circumstances. See *Masius v. Wilson, supra,* at 213 Md. 264, 131 A. 2d 486, and cases there cited.

There was no question suggested with regard to Mrs. Hoyt's mental condition or knowledge and understanding of her financial affairs, and the testimony amply supports the view that she was fully competent mentally and there is nothing to indicate that she did not know what she was doing. The Chancellor so found in his first opinion delivered at the conclusion of the first hearing, and there was no subsequent change in this finding.

We quote below from the Chancellor's opinion of January 11, 1957, in which he set forth his ultimate findings of fact with regard to the principal issues in this case:

"The additional testimony * * * is for the most part, of conversation after the will was drawn in * * * March, 1955, and after the conference to which Mr. Blair has testified. Mr. Blair's testimony makes it entirely clear that he explained to Mrs. Hoyt, and Mrs. Hoyt understood, that unless the bank books were changed the proceeds would not pass under her will. That is what Mr. Blair called strongly to Mrs. Hoyt's attention, and that is why, he testified, a power-of-attorney was executed. There is no question in my mind but that Mrs. Hoyt understood that unless she did make that change, the will would not control the ownership of the funds.

"Having had the benefit of seeing the witnesses on the witness stand and hearing their testimony, I now find that Mrs. Hoyt changed her mind and did not wish the ownership of those bank accounts changed. Mrs. Walter, the granddaughter, of course, may be considered to have a personal interest just as Mr. Jarusek has in the matter, but her testimony is clear to the effect that not once but a number of times after the will was executed, her grandmother, Mrs. Hoyt, explained to her that she was leaving the bank books in both names and that she wanted Margaret Haas to have everything, and Mrs. Hoyt showed the witness the bank accounts. Mr. Primus' testimony is to the same effect, and he is in a neutral position. He is related in indirect ways to both Mrs. Haas and Mr[s]. Jarusek. I am impressed with his testimony and believe it to be true. And to some extent it is corroborated by Mrs. Fiddis because Mrs. Fiddis says that in her presence Mrs. Hoyt, at the nursing home, showed Mr. Primus both bank accounts and Mrs. Fiddis heard Mrs. Hoyt say they were in joint names with the defendant, Mrs. Haas. As I say, Mr. Blair had made known to Mrs. Hoyt the legal effect of leaving the bank accounts in the joint names. She said not only to her granddaughter but to Mr. Primus that she wished them so kept and she wished the proceeds to go to Mrs. Haas.

"I have also considered the testimony of the Jaruseks and Mr. Smith, and in most respects it is not nearly as definite and specific as is the testimony of the other witnesses as to what was said; * * * .

"Weighing all the testimony and the facts in the case, I am now convinced that Mrs. Hoyt intended the bank accounts to remain as they were. In effect she changed the disposition as to which Mr. Blair testified and her instructions to her stepdaughter, Mrs. Haas, to make that change. I find that, after her talks with Mr. Blair, she decided to let the bank accounts remain in her name and Mrs. Haas', and the proceeds upon her death to go entirely to Mrs. Haas."

Rule 886 of the Maryland Rules, which is applicable to appeals in cases tried by the lower court without a jury, provides in part that "the judgment of the lower court will not

be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." To the same effect see *Archway Motors, Inc. v. Edelson,* 202 Md. 75, 95 A. 2d 475; *Smith v. Bounds Package Corp.,* 206 Md. 74, 110 A. 2d 71; *Frank v. Frank,* 207 Md. 124, 113 A. 2d 411; *Hite v. Hite,* 210 Md. 576, 124 A. 2d 581. The appellant has shown no basis upon which we should be warranted in rejecting the findings of fact of the Chancellor. On these findings we think that the defendants have established the facts necessary to sustain the transactions against attacks based upon the breach of any obligation arising from either an express oral trust or from any confidential relationship which may have existed.

It is hardly necessary to cite authority in this State in support of the view that the establishment of a joint savings account in substantially the trust form here involved is a sufficient declaration of trust, if the presumption arising therefrom is not explained or rebutted, and creates a present property right in the donee—in this instance, Mrs. Haas. *Milholland v. Whalen,* 89 Md. 212, 43 A. 43; and, among more recent cases, *Hancock v. Savings Bank of Baltimore,* 199 Md. 163, 85 A. 2d 770; *Whittington v. Whittington,* 205 Md. 1, 106 A. 2d 72; *Bierau v. Bohemian Bldg., Loan & Sav. Ass'n,* 205 Md. 456, 109 A. 2d 120; *Tribull v. Tribull,* 208 Md. 490, 119 A. 2d 399; *Shook v. Shook,* 213 Md. 603, 132 A. 2d 460. Mr. Blair, Sr.'s advice to Mrs. Hoyt was in accordance with this rule and made it clear to her that such a form of account would vest ownership of the funds on deposit therein at the time of Mrs. Hoyt's death in Mrs. Haas, and that Mrs. Hoyt's will would not be operative with regard thereto if Mrs. Haas survived Mrs. Hoyt.

There is no merit in the appellant's contention that the defendants are changing Mrs. Hoyt's will by parol evidence. The question is whether or not these joint savings accounts were subject to Mrs. Hoyt's will. No change is made in the will itself.

There are numerous ways in which a testator may change the effect of his will without changing its terms at all. For

example, every accretion to his assets through his earnings and every expenditure of his funds may increase or reduce his property subject to his will. Cases which illustrate more strikingly a testator's power, by a non-testamentary act, to change the effect of his will are those dealing with bequests of the contents of various receptacles or containers. In such cases he may bequeath the contents of a certain box, or chest, safe deposit box, envelope, house, etc. to one or more beneficiaries. During the period between the execution of the will and the date of death, he may, for any reason, add to or subtract from the "contents" as he sees fit, simply by performing the physical act of placing additional property in the receptacle or of removing property that is already there. He may thus increase a thousand fold the portion of one recipient, or reduce another's to zero, all without a single written word or witness. Such wills are, however, uniformly accepted as valid. See *Buchwald v. Buchwald,* 175 Md. 103, 111-114, 199 A. 795, and cases and authorities therein cited. See also the annotation at 120 A. L. R. 1210, entitled "Bequests of 'Contents' ".

Another example of the power of a testator to make changes in the operation of his will may be found in the ademption of legacies. See *Miller, Construction of Wills,* Secs. 140-142. In the instant case there could hardly be said to have been an ademption of a bequest of either of the joint savings accounts, because there was no specific bequest of these accounts or of either of them. See *Miller, op. cit.,* Sec. 141, at p. 385.

In his brief the appellant stated a question with regard to the right of the clerk of the trial court to insist upon the payment of costs as a condition precedent to assembling the papers in the case for use on appeal. He submits no authorities and makes no argument on the question. It has nothing to do with the merits of the controversy and appears to have been abandoned. We see no occasion to consider it further. He has had his appeal in any event.

In accordance with the above views the decree of the Circuit Court is affirmed.

*Decree affirmed, with costs.*