# IRENE E. POTTS *v.* MARY O. EMERICK,

## Personal Representative

[No. 99, September Term, 1981.]

*Decided June 1, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*John C. Sullivan* for appellant.

*W. Stevens Hidey* for appellee.

RODOWSKY, J., delivered the opinion of the Court.

This contest over joint bank account funds, between the estate of the deceased depositor and the designated account survivor, has a novel feature. Some years after the trust accounts were established, the beneficiary of the trust accounts promised the settlor to use the funds to be acquired by survivorship for purposes specified in the settlor's will. The beneficiary now repudiates that promise. We shall hold that the settlor's testamentary estate is entitled to relief by way of a constructive trust.

Rose H. Timbrook (Timbrook), a widow of Cumberland, Allegany County, died there on July 24, 1979, at age 67. She left a will dated July 13, 1979. Her personal representative is her cousin, Mary O. Emerick (Emerick), the appellee. Timbrook had a married sister, the appellant, Irene E. Potts (Potts). Funds on deposit in three joint accounts established by Timbrook were paid by the depositories after Timbrook's death to Potts, as survivor. Emerick sued Potts for part of the funds and obtained judgment below.

One of the three accounts was a savings account which Timbrook had maintained with First National Bank and Trust Company of Western Maryland. Potts' name was added [1] to the account on August 3, 1976, when the account

---

1. The passbook for this account reads: "Rose H. Timbrook IN TRUST FOR SELF and Irene E. Potts joint owners, subject to the order of either; the

balance was $26,386.23. Timbrook also had a checking account at that bank. The same day Timbrook arranged for Potts to be authorized to draw against the checking account. That account's signature card states that "the undersigned, hereby agree to, and do give, each to the other, a joint ownership in all monies now on deposit or at any time hereafter deposited by us or for us . . . in our account with [the bank] payable to either of us, or to the survivor." Because the checking account was not in trust form, the trial court held the funds on deposit in it did not pass to Potts by survivorship.[2] The third account was with First Peoples Community Federal Credit Union. On July 19, 1977, Potts was designated a joint owner of this account, which was in trust form and subject only to Timbrook's order. Because our decision would not be affected were the checking account a trust form of account, we shall consider all of the accounts to have been in a form sufficient to pass sole ownership of the funds to Potts on Timbrook's death, and shall not distinguish between them.

By an unattested paper writing in Timbrook's own hand, dated October 3, 1977, Timbrook wrote that she was making out her will. In relevant part the paper reads:

> I want my brother Ralph Spera to have $2000 my brother Sebastain [sic] Spera $1000 and my niece Janet Currence $2000 that is provided there is enough money left in the bank. I may have to use my money in case of sickness or for personal use. Every thing I own is in my sister's name too Irene E. Potts.

balance at the death of either to belong to the survivor." This is substantially the form approved in Milholland v. Whalen, 89 Md. 212, 43 A. 43 (1899) (*Milholland* II).

**2.** The trial court relied on Whalen v. Milholland, 89 Md. 199, 43 A. 45 (1899) (*Milholland* I). We note, however, that among the bank records placed in evidence was an authorization form, apparently signed by Timbrook, "to change my checking account . . . to a joint account to read as follows: Rose H. Timbrook, in trust for self and Irene E. Potts, joint owners, subject to the order of either; the balance at the death of either to the survivor." *See* Sturgis v. Citizens Nat'l Bank, 152 Md. 654, 137 A. 378 (1927).

Timbrook had terminal cancer. She had returned to her home after having been released from the hospital. Timbrook asked Emerick, who was employed by a Cumberland attorney, to have the lawyer see her.[3] Timbrook met with the attorney at her home on July 10, 1979, with Emerick and Potts present. Counsel was shown the October 3, 1977 writing, and he reviewed the proposed bequests with Timbrook. He asked about the value of the estate. Timbrook went over the amounts of money she had in the various accounts. She asked to have a new will prepared. The attorney testified that on that occasion Potts said "she fully understood her sister's intentions, that she would pay all of the bequests and the expenses and the gifts from the funds in the joint accounts." At that meeting Timbrook also produced about 100 government savings bonds which counsel advised should be cashed.

Execution of Timbrook's will took place at her home on July 13. Again present were the attorney, Potts and Emerick. Timbrook stated that she had cashed the savings bonds, that the proceeds amounted to approximately $5,000, and that the cash had been deposited in the savings account.[4] The lawyer handed the ribbon copy of the proposed will to Timbrook, and furnished copies of it to Potts and Emerick. He then read the will aloud section by section and explained the various provisions. Payment by the personal representative of debts and funeral expenses was directed. Monetary bequests to the brothers, to a niece and to Emerick aggregated $5,500. Timbrook devised her undivided one-fourth interest in her home equally to her two brothers and to Potts. The residue was given to Potts. Taxes were directed to be paid from the residue. Emerick was appointed personal representative. Item SIXTH provided:

I am presently the owner of a checking account and a savings account with the First National Bank

---

**3.** This attorney testified at trial and was neither trial nor appellate counsel for Emerick.

**4.** The passbook for the savings account reflects deposits of $5,321.74 and $100 on July 11, 1979, as well as the crediting of interest of $362.03 which brought the balance in the savings account at that time to $35,300.53.

and Trust Company of Western Maryland, as well as a savings account with the First Peoples Community Federal Credit Union (formerly the Celanese Federal Credit Union), upon which I have placed my sister's name, Irene E. Potts, on each account, and it is my desire and request that my said sister use these funds to pay all of my just debts, funeral expenses, taxes, costs and expenses in connection with the administration of my estate and all of the monetary bequests and residuary bequest heretofore set forth, *which my said sister fully understands and has agreed to use the said accounts for this purpose.* [Emphasis added.]

There was some discussion concerning this provision. Counsel testified that "Mrs. Potts again reaffirmed that she would use the money to pay Mrs. Timbrook's bills, her expenses, her bequests, and all of the gifts to her brothers and the people who she left money to." Timbrook executed the will, which was witnessed by Potts and the attorney. Following execution of the will, the attorney testified that Potts asked him whether her brothers could take the money after she had paid the expenses and gifts, to which counsel replied that it would not be possible in light of the residuary clause.[5]

After Timbrook's death, Potts withdrew all of the funds in the savings account ($35,694.32), in the checking account ($2,780.88) and in the credit union account ($5,905.34). She paid the funeral bill of $1,693 and an additional $97.97 for various utility bills and a grave marker. Potts then consulted her present counsel. Based on his advice she filed claims in the Timbrook estate for the above expenditures and refused to pay any further sums to or on behalf of the estate. The personal representative then brought the instant action in the Circuit Court for Allegany County in equity.

---

5. At trial Potts testified that she read the will at this meeting, but remained silent. The court asked Potts, "[i]f in fact you had not agreed to use these funds for the payment as expressed in the will, why didn't you say so then?" Potts' answer was that she was "too nervous."

An October 29, 1979 inventory of Timbrook's estate (which did not at that time schedule the joint account funds) listed the interest in the home at $1,625, tangible personal property of $1,950 and cash of $1,535.79. After the payment of court costs and a banking service charge, the estate cash at time of trial was $1,435.54. The amount needed for monetary bequests, inheritance taxes and claims against the estate was $8,288.20 so that the estate cash deficit was $6,852.66.

The chancellor, in a written opinion, concluded as follows:

> Mrs. Potts accepted the bank accounts for the first time after her sister's death with the previously expressed understanding that she was to apply them for the purposes expressed in the will and retain the balance for herself. She cannot in good conscience be permitted to agree to that express intention while Mrs. Timbrook was alive and capable of changing the accounts under her control and then disavow the agreement after the death of her benefactor.
>
> It is true that intention when the instruments were created is critical, but that intention may be established by parol, or by will, or other documents establishing the true intent of the original owner. See *Bauer v. Harmon,* 161 Md. 131, (1931), *Shook v. Shook,* 213 Md. 603, (1957).

The decree ordered Potts to pay forthwith to the personal representative the sum of $6,852.66 together with interest at the rate of 6% from July 24, 1979, and to pay to the personal representative "such further sum, if any, necessary to pay the remaining costs of administration."

Potts appealed to the Court of Special Appeals and we granted certiorari prior to consideration of the case by the intermediate appellate court.

It is Potts' position that ownership of the funds in the joint accounts passed to her absolutely by survivorship. In essence she asserts (1) that the terms of the bank account trusts were

fixed as of the date of their creation, in accordance with Timbrook's intent at that time; and (2) that any attempt thereafter to alter the trust terms, or to impose a further trust on her beneficial interests, failed, because Timbrook's power to alter the trusts was limited to the power to revoke them *pro tanto* by *inter vivos* withdrawal of the funds on deposit, and this did not occur.[6] Emerick's analysis is that a modification of the terms of the joint account trusts was effected on July 13, 1979, by way of a declaration by Timbrook which was assented to by the only beneficiary, Potts. Alternatively, Emerick argues that Potts is estopped from relying on the presumption that Timbrook intended to create trusts at the time the joint accounts were established.

The chancellor seems to have concluded that Timbrook did not intend to create trusts for Potts when Timbrook caused Potts' name to be added to the accounts in 1976 and 1977. However, we need not, in this case, determine whether the evidence supports that conclusion. We may assume, *arguendo,* that Potts acquired the ownership of the account funds by survivorship. But the opinion of the trial court clearly reflects a finding, which is fully supported by the evidence, that Timbrook's intention, at least at the time when her will was prepared and executed, and up until her death, was that the trust account funds be used for the purposes stated in that will. The chancellor further found that Potts promised so to use the funds. As the trial judge correctly observed, Potts "cannot in good conscience be permitted to agree to [Timbrook's] express intention while Mrs. Timbrook was alive and capable of changing the accounts under her control and then disavow the agreement after the death of her benefactor." These findings support the imposition of a constructive trust for the benefit of Timbrook's estate on the theory of unjust enrichment.

**6.** In this respect, Potts places principal emphasis on Bradford v. Eutaw Savings Bank, 186 Md. 127, 132, 46 A.2d 284, 286 (1946), where we said:

[T]he Maryland decisions indicate quite clearly that a bank deposit trust is revocable only during the settlor's lifetime by withdrawal of the fund. [Citations omitted.] In harmony with these decisions, we hold that such a trust cannot be revoked, either in whole or in part, by a will.

Were Potts to have obtained ownership of the funds from Timbrook under the latter's will, or by intestacy, this case would fall expressly within the rule set forth in § 186 of the Restatement of Restitution (1937):

> (1) Where a testator devises or bequeaths property to a person relying upon his agreement to hold the property in trust for or to convey it to a third person, the devisee or legatee holds the property upon a constructive trust for the third person.
>
> (2) Where a person dies intestate relying upon an agreement by his heir or next of kin to hold the property which he acquires by such intestacy in trust for or to convey it to a third person, the heir or next of kin holds the property upon a constructive trust for the third person.

Comment b to § 186 states in pertinent part: "Although the agreement cannot be enforced . . . as an express trust or contract, the devisee or legatee or heir or next of kin would be unjustly enriched if he were permitted to retain the property which he would not have acquired but for his agreement to hold it in trust for or to convey it to a third person." The trust is impressed to prevent unjust enrichment and does not require a showing of actual fraud. *Clark v. Tibbetts,* 167 F.2d 397, 402 (2d Cir. 1948) (Clark, J., with Swan and Augustus N. Hand).

Under a restitution analysis, it is of no consequence that the Timbrook-Potts agreement was made several years after the joint accounts were established. Comment d to Restatement of Restitution § 186 sets forth:

> It is immaterial whether the agreement of the devisee or legatee was made prior to or at the time of or after the execution of the will, provided that it was made at some time before the death of the testator. An agreement which induces the testator to refrain from revoking his will is as effective as an agreement which induces him to make a will.

This rule was applied in *Belknap v. Tillotson,* 82 N.J. Eq. 271, 88 A. 841 (1913). The essential facts were that the testator left a will dated January 26, 1909 by which he gave $6,000 to his niece, Irene. By letter of September 1, 1909, the testator asked Irene, in effect, to use only the income on that sum and, on her death, to bequeath it to his wife, sister and nephew. Irene agreed by letter of September 9, 1909. The testator died September 3, 1911 and Irene died five days later, without having provided, as promised, for the intended beneficiaries. This was due to procrastination and not because of Irene's lack of intent to perform at the time she made the promise. Irene's executor was held to be a constructive trustee of the fund. Although there was some evidence that the testator may have written Irene that he would change his will if she did not agree, the court concluded that it was not necessary for him to have made a threat for the constructive trust to apply. The New Jersey court made plain that it was not enforcing the promise as a contract (*id.* at 279, 88 A. at 844):

> The testator did not promise that he would not change his will in the item that was in [Irene's] favor in consideration of her promise to make her will in accordance with the promise. The testator by his will was making a gift to Irene. He had the right to change, alter or revoke it at any time. He did not bind Irene to give up any part of her estate.

Rather, the analysis is on constructive trust-unjust enrichment-restitution grounds (*id.* at 279-80, 88 A. at 844):

> At the time of the signing of the promise, the will of Irene, duly executed, was in existence, and has since been admitted to probate, which disappointed the wish of the testator and violated her solemn promise. The permitting of such will to exist was a fraud on the testator and on the beneficiaries named in the promise. The promise of Irene having been the inducement which led the testator to leave his will unaltered, and her will being then in

existence which violated her promise, her failure to alter the same so as to comply with the promise, made the inducement fraudulent, and it is on this ground that equity assumes jurisdiction for the purpose of preventing the statute of wills from becoming a means of fraud.

Other decisions in which a testator was induced to leave a pre-existing will unchanged, because of the subsequent promise of a legatee to make a gift to a third party, include: *Dowd v. Tucker,* 41 Conn. 197 (1874); *Ragsdale v. Ragsdale,* 68 Miss. 92, 8 So. 315 (1890); *O'Boyle v. Brenner,* 189 Misc. 1058, 73 N.Y.S.2d 687 (1947), *modified,* 273 A.D. 683, 79 N.Y.S.2d 84 (1948), *appeal dismissed,* 301 N.Y. 685, 95 N.E.2d 47 (1950); and *In re Hoffner's Estate,* 161 Pa. 331, 29 A. 33 (1894). In the case at bar, not only was Timbrook induced to leave the joint accounts unrevoked by withdrawal during her lifetime, but she also added to the accounts by depositing the proceeds from the government bonds after Potts had promised to use the joint account funds for the purposes stated in the will, which was then under preparation.

Under this analysis, it is also immaterial that the joint account funds may now be owned by Potts due to her status as the surviving beneficiary. The relief by way of constructive trust operates on the property or fund *after* it is in the hands of the promisor. The analysis is explained in *Trustees of Amherst College v. Ritch,* 151 N.Y. 282, 324-25, 45 N.E. 876, 887 (1897):

> The trust does not act directly upon the will by modifying the gift, for the law requires wills to be wholly in writing, but it acts upon the gift itself as it reaches the possession of the legatee, or as soon as he is entitled to receive it. The theory is that the will has full effect by passing an absolute legacy to the legatee, and that then equity, in order to defeat fraud, raises a trust in favor of those intended to be benefited by the testator, and compels the legatee,

as a trustee *ex maleficio,* to turn over the gift to them. The law, not the will, fastens the trust upon the fund by requiring the legatee to act in accordance with the instructions of the testator and his own promise. Neither the Statute of Frauds nor the Statute of Wills applies, because the will takes effect as written and proved, but to promote justice and prevent wrong the courts compel the legatee to dispose of his gift in accordance with equity and good conscience.

The principle is further illustrated in *Voelkel v. Tohulka,* 236 Ind. 588, 141 N.E.2d 344, *cert. denied,* 355 U.S. 891, 78 S. Ct. 263, 2 L. Ed. 2d 189 (1957) (agreement made between owner of life insurance policy and intended beneficiary prior to effecting change of beneficiary); *McDowell v. McDowell,* 141 Iowa 286, 119 N.W. 702 (1909); *Winder v. Scholey,* 83 Ohio St. 204, 93 N.E. 1098 (1910); *Penza Estate,* 59 Pa. D.&C.2d 19 (1973); *Olsen v. First National Bank,* 76 S.D. 605, 83 N.W.2d 842 (1957). And *see* G. Bogert, *Trusts and Trustees* § 499 at 487-93 (rev. 2d ed. 1978); I *Scott on Trusts* §§ 55.1-55.3 (3d ed. 1967); Restatement (Second) of Trusts, § 55 (1959); Costigan, *Constructive Trusts Based on Promises Made to Secure Bequests, Devises, or Intestate Succession,* 28 Harv. L. Rev. 237 (1915); Scott, *Conveyances Upon Trusts Not Properly Declared,* 37 Harv. L. Rev. 653 (1924).

Early recognition in this State of equitable relief in cases analogous to that at bar is found in *Owings' Case,* 1 Bland 370 (1827-28). It was an action on behalf of a mother to set aside a deed from her to her daughter on grounds of incompetency. The daughter proved that her deceased father had omitted making any provision for her in his will because of an agreement between father and mother, under which the mother promised she would, at death, give her own estate to the daughter. Although the deed from mother to daughter was cancelled, the mother's guardian was directed to deed the property to the defendant, subject to a life estate in the mother. The Maryland Court of Chancery set forth the

506

following review of the authorities as of that time (*id.* at 402):

It is now regarded as the well settled doctrine of the Court of Chancery in England, that if a person had, before his death, communicated his intention to make, or alter his will, and give a legacy, or portion of his property, to a certain individual, and the heir, or any one else, had interposed, and prevented the making or alteration of a will by a promise to pay the amount of the proposed legacy, to transfer the property, or to give anything else in lieu of it to the individual thus intended to be bene-fited; that the promise so made is binding, as being made on a consideration of loss to the individual; who may therefore enforce the specific performance of it in a Court of equity. The Statute of Frauds has been repeatedly urged as an objection against such promises, and the objection has always been overruled. The parent or friend of the individual intended to be benefited, being put at rest, and relying upon such promise, dies in perfect confi-dence that it will be fulfilled. But if the individual who has been so disappointed of an express provi-sion by the deceased, could not have the promise enforced, his loss would be altogether irretrievable. The heir, or person making it, would be suffered to frustrate the intention of the deceased; to practise a fraud with perfect impunity; and the Statute of Frauds, if it were allowed to apply, would be made to operate for the protection instead of the prevention of fraud. *Chamberlaine v. Chamberlaine,* 2 *Freem.* 34; *Oldham v. Litchford,* 2 *Freem.* 284; *Thynn v. Thynn,* 1 *Vern.* 296; *Drakeford v. Wilk,* 3 *Atk.* 539; *Reech v. Kennegal,* 1 *Ves.* 124; *Dixon v. Olmius,* 1 *Cox,* 414; *Strickland v. Alridge,* 9 *Ves.* 519; *Mestaer v. Gillespie,* 11 *Ves.* 638; *Chamberlaine v. Agar,* 2 *Ves. & Bea.* 259.

This Court has also granted constructive trust relief against a promisor who received death benefits as named beneficiary under certificates issued by a fraternal society. In *Clark v. Callahan,* 105 Md. 600, 66 A. 618 (1907), a Colonel Raphun was separated from his wife and undertook to change the beneficiaries of his certificates with two fraternal orders so that benefits would be payable on his death equally to his married daughter, Mrs. Callahan, and to his foster daughter. Upon learning that the societies would not permit the designation of one not related by blood, Colonel Raphun obtained the promise of Mrs. Callahan that she, as sole named beneficiary, would pay one-half of the death benefits to the foster daughter. Just as Potts argues in this case, Mrs. Callahan argued that the promisee had effectively parted with dominion over the property before the declaration of any trust and that it was then too late to fasten a trust upon the property. As an alternative ground of decision, we said (*id.* at 616-17, 66 A. at 621-22):

> This is not a case where absolute dominion over the subject of the trust is parted with by the donor. Where an absolute and unconditional gift of money or property is made, and subsequently the donor attempts to impress a trust upon the subject of the gift, it might be conceded the attempt would be futile. Here, after the transfer of these certificates to Mrs. Callahan's name, Col. Raphun retained the possession of them up to the moment of his death, and he had the same power and right, at any time, without the consent of his daughter, to return them to the [fraternal societies] and obtain other certificates, naming other beneficiaries .... If it were conceded then, that Mrs. Callahan was substituted as beneficiary without the creation of any trust in the proceeds thereof at or before that time, and the trust was *subsequently* declared by him, and accepted or assented to by Mrs. Callahan ... can it be doubted that Col. Raphun could and would have revoked the substitution of Mrs. Callahan if she had, either at the time of the attempt to create the

trust, declined to execute it, or having assented thereto, subsequently informed him she would not execute it? Can she now, after securing to herself the fruits of these certificates by repeated assurances that she would carry out her father's directions to share the proceeds with the plaintiff be permitted, to repudiate her promises after his death, and thus defraud both the dead and the living? We think not .... Such conduct as Mrs. Callahan's, even assuming that the creation of the trust was subsequent to her substitution as beneficiary, constitutes fraud, and gives jurisdiction to equity to defeat its consummation. By assenting to her father's wishes and directions she led him to make no other disposition in favor of the plaintiff, and fastened upon her own conscience a trust or confidence which she cannot repudiate without fraud, and which a Court of Equity will enforce. [Emphasis in original.]

A decree in favor of Mrs. Callahan was reversed and the case remanded for the entry of a decree against her for one-half of the death benefits.

*Coyne v. Supreme Conclave of the Improved Order of Heptasophs,* 106 Md. 54, 66 A. 704 (1907), is to the same effect as *Clark v. Callahan, supra.*

We see no reason why the principle recognized in Restatement of Restitution § 186, as to wills and intestate succession, and in *Clark v. Callahan,* as to insurance, should not be applied here. Timbrook intended that Potts use the joint accounts to fund the provisions of the will. Potts promised to use the funds for the purposes stated in Timbrook's will. In reliance on Potts' promise, Timbrook refrained from exercising her reserved power to revoke the trust accounts; she went to her death in the belief that her intentions as to the funds on deposit would be carried out by Potts. These are the elements which give rise to a constructive trust. The chancellor was correct in granting relief against Potts.

The trial court's finding, implicit in its decree, that

Timbrook's estate was the intended beneficiary of the amounts to be paid by Potts is not clearly erroneous. As evidenced by item SIXTH of the will, Potts was to use the joint account funds to pay all of Timbrook's "just debts, funeral expenses ... costs and expenses in connection with the administration of [Timbrook's] estate . . . ." These are estate obligations. The funds were also to be used to pay the monetary bequests and residuary bequest set forth in the will, and the residue of the estate was charged with the payment of taxes on Timbrook's gifts. The trial court could properly have concluded that the amount of these bequests was intended to be paid to the estate, as opposed to payment directly to various creditors, the Register of Wills and legatees.

Emerick, at trial, voluntarily limited her claim to the net cash deficit of the estate. That is the relief which was granted by the decree below, from which there is no cross-appeal by Emerick.

Potts also contends that the trial court committed error in admitting into evidence the October 3, 1977 longhand "will." It is said to have been irrelevant because it did not relate to Timbrook's intent at the time the accounts were established. Even if the writing were not admissible, the error, if any, was not prejudicial. Our basis for affirming is not dependent on a finding by the trial court that Timbrook did not intend, at the time the joint accounts were established, to create a trust for the benefit of Potts.

*Judgment of the Circuit Court for Allegany County affirmed. Appellant to pay the costs.*